UNITED STATES of America, Plaintiff,

v.

Robert F. SIMONE, Defendant.

Crim. No. 85–330.

United States District Court,
D. New Jersey.

Jan. 30, 1986.

Stuart L. Peim, Asst. U.S. Atty., Newark, N.J., for plaintiff, U.S.A.

Stephen Robert LaCheen, Philadelphia, Pa., for defendant, Robert F. Simone.

## OPINION

RODRIGUEZ, District Judge.

The defendant, Robert F. Simone, Esquire, is accused of having committed perjury before the Honorable Harold A. Ackerman, U.S.D.J. for the District of New Jersey during the course of a disqualification hearing on October 16, 1984. Although there are a variety of defenses to the charge of perjury, defendant has raised two somewhat novel defenses at the pretrial stage in the context of the present motion to dismiss the indictment.[1] First, defendant contends that this Court should dismiss the indictment because he is the victim of a "perjury trap" set by the government. Second, defendant asserts that he is the victim of a selective prosecution. Defendant seeks, at the least, a hearing to explore the government's conduct in this case.

Before embarking on an analysis of these defenses, it is necessary to set forth a brief chronology of the events leading up to the defendant's indictment.

## CHRONOLOGY

In 1981, the Federal Bureau of Investigation began an undercover investigation into organized crime's involvement in Atlantic City. During the course of that investigation, on April 24, 1984, Simone was called to appear as a witness before the Grand Jury. As a result of the investigation, on September 18, 1984, a federal grand jury returned an indictment against Philip Leonetti, charging Leonetti with conspiracy to extort over $650,000 and two substantive counts of extortion in violation of the Hobbs Act. At the time, Simone was legal counsel to Leonetti. The government, however, objected to his representation on the following grounds:

(1) Simone was an unindicted co-conspirator in the Leonetti indictment and the subject of a continuing grand jury investigation;

(2) Evidence to be introduced at trial, including tape recordings, would identify Simone as an unindicted co-conspirator;

(3) Simone was a witness to certain conspiratorial acts;

(4) Simone had refused to answer questions before the Grand Jury on the grounds that the answers would tend to incriminate him and had broached the possibility of receiving immunity;

(5) Simone had and does represent other unindicted co-conspirators, including Nicodemo Scarfo and Frank Gerace; and

(6) Simone previously represented another witness to the conspiratorial acts, but withdrew his representation when informed by the government of his own status as a witness in the case.

Letter dated September 20, 1984 from Stuart Peim, A.U.S.A., to Robert F. Si-

---

**1.** Defendant also seeks a dismissal of the indictment on the following grounds: (1) improper references to organized crime in the indictment prejudiced the Grand Jury against him; (2) the alleged perjurious statements were not material to the disqualification proceedings; and (3) the indictment is multiplicitous. These issues will be addressed in separate opinions.

mone, Esquire (hereinafter the "September 20 letter").

Leonetti was arraigned before the Hon. Harold A. Ackerman, U.S.D.J., on September 28, 1984 and the government moved formally at that time to disqualify Simone from representing him. The disqualification hearings began on September 28; continued on October 5; and culminated on October 16, when Simone was sworn, took the stand and answered questions concerning the government's contention that he was a potential witness in his client's case.[2] On October 23, 1984, the government made an *ex parte* submission of transcripts and summaries of consensual taped conversations on which Simone was a speaker to Judge Ackerman for an *in camera* inspection. It is Simone's testimony, when viewed in light of his taped statements, which forms the basis of the present perjury indictment. On November 19, 1984, Judge Ackerman ruled that (1) Simone was not entitled to review the tapes as a release of the tapes "would jeopardize witnesses and an extremely sensitive investigation" and (2) Simone was disqualified from representing Leonetti. The present indictment charging perjury was returned against Simone on September 19, 1985.

### PERJURY TRAP DEFENSE

The defendant first contends that the conduct of the government was so outrageous as to deny him due process under the Fifth Amendment in that he alleges that the government created and forced him into a "perjury trap." This argument is based essentially upon one act by the government which the defendant alleges fell below the standard acceptable to proper use of governmental power. According to the defendant, the government concealed from him and from the Court the existence of taped conversations on which he was a speaker, and then after he testified, made a secret submission of these tapes to the Court *in camera*. In other words, defend-

ant argues that the government knew the answers to the questions it planned to ask and knew the answers he was going to give, having heard them before, and that its only purpose in placing him on the witness stand was to obtain a perjury charge.

Defendant concedes that a prosecutor need not warn a witness before a Grand Jury of contrary surveillance materials, but argues that "[s]uch a principle would not be applicable in the context of a disqualification hearing where critical First and Sixth Amendment rights are implicated." (Defendant's brief, at 12). The defendant then suggests that if he "had ... been provided with copies of these transcripts when he requested them, [h]e would have had an opportunity to either explain what they meant, recant, further resist disqualification, or agree to be disqualified." (Defendant's brief, at 8). It is defendant's position that ours is a "government of laws and not of men" and that there are bounds beyond which the prosecution may not go without offending traditional notions of fair play.

The question before this Court is whether, on the record before it, the indictment should be dismissed as having been obtained in violation of Fifth Amendment due process principles, or whether there is insufficient evidence before the Court to make this decision and a due process hearing is required to further explore the government's conduct. This Court holds, for the reasons set forth below, that there is no need for an evidentiary hearing as there is sufficient evidence in the record for it to determine that defendant's due process rights have not been violated. Accordingly, defendant's motion to dismiss the indictment on the ground that he was "trapped" into committing perjury is denied.

#### a. *Definitions*

█ The essential elements of perjury are that (1) the declarant must be under oath, (2) the testimony must have been

---

**2.** The October 16, 1984 hearing on disqualification will be referred to as the "October 16 hearing".

given in a proceeding before a court of the United States, (3) the declarant must have knowingly made a false statement and (4) the statement must be material to the proceeding before the court. 18 U.S.C. § 1623(a) (1984); *United States v. Whimpy*, 531 F.2d 768 (5th Cir.1976).

Perjury is a crime of magnitude as it threatens the fair and effective administration of justice. As the Supreme Court has stated:

> Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. Effective restraints against this type of egregious offense are therefore imperative.

*United States v. Mandujano*, 425 U.S. 564, 576, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976). Since it is "only from the mouths of those having knowledge of the [events] that the facts can be ascertained," *Brown v. Walker*, 161 U.S. 591, 610, 16 S.Ct. 644, 652, 40 L.Ed. 819 (1896), great trust must be placed in a witness's ability to testify truthfully. So critical is this need for truthful testimony that Congress has determined that

> [t]he power of subpoena, broad as it is, and the power of contempt for refusing to answer, drastic as that is—*and even the solemnity of the oath*—cannot insure truthful answers.

*Mandujano, supra*, 425 U.S. at 576, 96 S.Ct. at 1776 (emphasis added). Consequently, to guarantee that testimony will be truthful, Congress has made false swearing a criminal act punishable by severe penalties. *Id.*

Against this fundamental need in our judicial system to rely on a person's sworn statement—his or her "word"—this Court now must weigh the defense of a perjury trap. This phrase suggests the deliberate use of a judicial proceeding to secure perjured testimony, a concept in itself abhorrent. *See* Gershman, *The Perjury Trap*, 129 U.Pa.L.Rev. 624 (1981).

■ The idea of a perjury trap is related to the statutory defense of entrapment; however, it does not fit within the established framework of an entrapment defense. The defense of entrapment is available:

> [W]hen the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.

*Sorrells v. United States*, 287 U.S. 435, 442, 53 S.Ct. 210, 212–13, 77 L.Ed. 413 (1932) as cited in *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958).

It is readily apparent that this defense is not applicable to the crime of perjury. First, perjury is not the kind of crime to which undercover techniques of law are directed. In other words, entrapment is typically found in those cases where undercover techniques were used by law enforcement officials to bait an individual through repeated temptations into committing a crime. Gershman, *supra*, 129 U.Pa.L.Rev. at 644. For example, the Supreme Court has held that an entrapment defense is applicable in the context of a narcotics offense where undercover agents approached the defendants, gained their confidence and repeatedly asked them to procure illegal substances. *See, e.g., Sherman, supra; Sorrells, supra.* Second, it is incongruous to speak of a predisposition to commit perjury. Gershman, *supra*, 129 U.Pa.L.Rev. at 644.

■ Although entrapment is limited to its statutory elements and is not a defense of constitutional magnitude, *United States v. Russell*, 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), outrageous government conduct may invoke constitutional principles of due process, *United States v. Beverly*, 723 F.2d 11 (3d Cir.1983), and provide a defense of constitutional dimension. *See also, Hampton v. United States*, 425 U.S. 484, 495 n. 7, 96 S.Ct. 1646, 1653 n. 7, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (government conduct must rise to a "demonstrable level of outrageousness" to compel acquittal on constitutional grounds); *United States v. Jannotti*, 673

F.2d 578, 608 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (defense of constitutional dimensions should only be accepted by the court to curb "the most intolerable government conduct"). In other words, in the context of a perjury indictment, the question is not whether the government implanted the disposition to speak falsely in the witness, but whether there was a premeditated design on the part of the government to trap the witness into perjury in such an *unfair* way that a due process test may provide a viable defense.[3]

■ Although the defendant would have the Court focus solely on the government's conduct in refusing to disclose the existence of the tapes and in submitting them to the Court *in camera,* the Court will not so limit its inquiry. Instead, the Court will conduct a due process analysis of how "fairly" Simone was treated prior to, during and after his testimony at the October 16 hearing.

#### b. *Fairness Analysis*

■ Basic to the concept of "fairness" to a witness is the government's warning of and the witness's knowledge of (1) the subject matter of the government's inquiry and (2) the witness's constitutional rights. *See, Mandujano, supra,* 425 U.S. at 600, 96 S.Ct. at 1788 (Brennan, J., concurring) (proof of warning prior to questioning can constitute proof of waiver of Fifth Amendment privilege). The fact that Simone was treated "fairly" by the government and was not "trapped" into committing perjury is readily apparent from a review of the record.

First, the record supports a finding that Simone was warned repeatedly prior to the questioning at the October 16 hearing that he was under criminal investigation for his involvement in a stated crime and that he was a witness to various illegal acts involving Philip Leonetti. In other words, he was without a doubt on *notice* of the Government's reasons for seeking his disqualification. Approximately six months before the October 16 hearing, on April 24, 1984, Simone was summoned to appear as a witness before the Grand Jury investigating Philip Leonetti. Immediately after Philip Leonetti was indicted, Simone requested from the government its reasons for insisting that he disqualify himself from representing Leonetti. Twenty-six days prior to the hearing, on September 20, 1984, Simone received a letter setting forth the government's belief that he was subject to continuing investigation, was an unindicted co-conspirator and was a witness to various illegal acts. (September 20 letter discussed *supra,* at 1266–1267). Eighteen days before the hearing, on September 28, 1984, the government moved to disqualify him on the grounds that he was an unindicted co-conspirator in the Leonetti indictment and was subject to a continuing Grand Jury investigation.

At that time, Simone denied the government's allegation that he was a courier for the Scarfo organized crime family. (September 28 T. 3:13–15).[4] Even after being reminded by the Court of the government's reasons for seeking his disqualification as set forth in the September 20 letter and being given the opportunity to disqualify himself without a hearing, (September 28

3. In analyzing how "fairly" the government treated Simone in its attempt to disqualify him from representing Leonetti, the Court is cautioned by one commentator not to confuse a "prosecutor's *expectation* that perjury will be committed—a matter of prosecutorial experience and judgment" with a "prosecutor's active *design* to cause perjury to be committed." Gershman, *supra,* 129 U.Pa.L.Rev. at 685; *see also, United States v. Chevoor,* 526 F.2d 178, 185 (1st Cir.1975) (Court could not say that calling witness "even in the anticipation that he would perjure himself is beyond the pale of permissible prosecutorial conduct"); *United States v.*

*Nickels,* 502 F.2d 1173, 1176 (7th Cir.1974), *cert. denied,* 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976) (Court found that even if the questions were asked with the expectation of perjured answers, the government did not solicit or encourage perjury; at most it created a situation in which perjury appeared expedient).

4. All references to notes of testimony will identify the hearing date, followed by the letter "T" and the page number, and where applicable, a colon followed by the line numbers.

T. 5), Simone insisted that he was prepared at that time to proceed with the hearing on disqualification. (September 28 T. 6). Prior to commencing the hearing, Judge Ackerman read into the record the September 20 letter (September 28 T. 10–13) and again asked Simone if he wanted to resist the government's application to have him disqualified (September 28 T. 13:8–12). Simone then requested that the government produce evidence to support its allegations. (September 28 T. 14:1–2).

From a review of the government's presentation of evidence and Simone's own statements during that presentation, it becomes clear that Simone was aware of the government's areas of concern—those very areas about which the government later questioned him under oath. On October 5, 1984, Simone admitted that he had been notified by letter that he was the subject of a continuing grand jury investigation. (October 5 T. 5–6). He admitted that he knew "within a matter of two to four weeks before the [Leonetti] indictment" that the government viewed him in a position of conflict (October 5 T. 6:16–25). When faced with the government's representation that it had informed him on the very day of the Leonetti indictment that he himself was viewed as an unindicted co-conspirator, he stated to the Court, "You can consider that a matter that's not in question, your Honor." (October 5 T. 7:9–15). In addition, he was aware that former Atlantic City Mayor Michael Matthews' confession referred to his presence at a meeting critical to the Leonetti indictment, (October 5 T. 24), and that the government could place him at a second critical meeting during which certain alleged conspiratorial acts occurred (October 5 T. 33). Clearly, Simone was well informed by the government of its reasons for wanting to disqualify him prior to testifying under oath.

Second, the record supports a finding that Simone knew prior to testifying under oath of his constitutional rights, including his Fifth Amendment right to refuse to answer any and all questions that might tend to incriminate him. During his appearance before the Grand Jury on April 24, 1984, he was specifically informed of this right by the prosecuting attorney, Mr. Bennett, (April 24 T. 3:12–16), and in fact invoked this privilege throughout the Grand Jury questioning. (*See, e.g.,* April 24 T. 5–7). Again, at the October 16 hearing when informed at that time that he was to be placed on the stand under oath, he stated, "I have a Fifth Amendment right I assume." (October 16 T. 32:8).

Prior to being questioned before the Grand Jury he was also informed that (1) his answers could be used against him in a subsequent criminal procedure (2) he could be prosecuted for perjury if he made a materially false statement intentionally and (3) he had a right to consult with an attorney. (April 24 T. 3–4). He also asserted the attorney-client privilege with respect to questions concerning a former client, Philip Leonetti, and a present client, Stanley Branche. During the course of the hearings on September 28 and October 16, Simone stated that he had consulted counsel, specifically a constitutional law attorney, "Mr. Lore, who had been advising [him] . . . ." (September 28 T. 2; October 16 T. 34). Simone also was aware that he might have an additional option in testifying, to receive immunity from prosecution. In fact, he specifically asked prior to being sworn at the October 16 hearing, "Are they going to give me immunity?" (October 16 T. 37:10).

The record evidence supports a conclusion that Simone understood the nature of his situation and his rights prior to giving testimony under oath on October 16. He was aware of the Grand Jury investigation (October 5 T. 4–7); he was given written notice of the government's objections to his representation of Philip Leonetti (September 20 letter); he was reminded of these objections throughout the proceedings; he was given opportunities to disqualify himself; he was instructed by the Court to reflect carefully on the government's objections (September 28 T. 31, 37); he was warned by the Court that the government was going to put him on the witness stand and informed by the government that he

would not be given immunity (October 16 T. 37); and he was informed of the scope of the questioning prior to the questions being asked. (October 16 T. 44–45).

This is not a situation like those in which the courts have voided perjury convictions. This is not a situation where the questioning body was acting outside the scope of its lawful authority and therefore, the courts voided the convictions. *Brown v. United States*, 245 F.2d 549 (8th Cir.1957) (grand jury inquired into matters not within its competence); *United States v. Cross*, 170 F.Supp. 303 (D.D.C.1959) (congressional committee acting as criminal investigator without legitimate legislative purpose).

Nor is this a situation where the questions asked were so unrelated to the inquiry before the Court that the only possible government motive in calling the witness could have been to induce perjury. *Brown v. United States, supra*, 245 F.2d at 553 (Eighth Circuit quoted district court's finding that grand jury activities had come " 'perilously close to being a fraud on the jurisdiction of this Court.' ").

Rather, this is a situation more akin to the situation before the district court in the Northern District of Illinois in *United States v. Gonzales*, 620 F.Supp. 1143 (N.D. Ill.1985). In that case, the Court was faced with an attorney who when called to appear before the Grand Jury, was told that he was the subject of the investigation, was advised of his Fifth Amendment rights, was given the option not to testify at all, was asked questions material to the grand jury investigation, gave answers consistent with past answers, and subsequently was charged with perjury. The Court refused to dismiss the indictment. In finding no perjury trap, the Court stated:

> While the story of the conversion of Saul on the road to Damascus perhaps lives on partly because genuine conversions are so uncommon, there was nothing inherently unfair in the government obtaining the defendant's testimony in the circumstances presented here. It was not inconceivable that, under oath for the first time, defendant would testify as the

government apparently believed the truth to be, and its case would be certain. If in fact he lied under oath, as the government charges, he cannot be insulated from a perjury charge solely because he said what the government anticipated he probably would say. Defendant had non-coercive options and he was fully warned if he, an attorney, chose to lie, that was his decision, and the government can compel him to answer for the consequences.

*Id.* at 1148–49.

When viewed against the backdrop of the record in this case, Simone's allegation that he was trapped into committing perjury is without merit. Simone is an attorney, who was informed of the areas of government concern well in advance of his testimony, who knew his constitutional rights and in fact invoked those rights on numerous occasions. The Court is not persuaded that the government's conduct in not bringing the existence of the defendant's taped conversations to the Court's and to the defendant's attention prior to his taking the stand is so outrageous as to constitute a material misrepresentation offending traditional notions of due process. Not only was the government under no obligation to inform Simone that it had information contrary to his "proferred" testimony, *see United States v. Goguen*, 723 F.2d 1012, 1018 (1st Cir.1983); *United States v. Jacobs*, 531 F.2d 87, 89 (2d Cir.1976); *United States v. Chevoor, supra*, 526 F.2d at 185; *United States v. Sun Myung Moon*, 532 F.Supp. 1360, 1371 (S.D.N.Y.1982); but also, in light of the facts of this case, the government had a sufficient reason for not disclosing the existence of the tapes in that disclosure would jeopardize an ongoing criminal investigation and perhaps the lives of undercover witnesses. Judge Ackerman ruled, after reviewing the tapes *in camera*, that Simone was not entitled to review them.

Defendant contends that the government's conduct in not revealing the existence of the tapes prior to his testimony is somehow more egregious in the instant

context of a disqualification hearing where his client's Sixth Amendment rights were at stake than in the more common context, exemplified in the above-mentioned cases, of a grand jury proceeding. This Court does not agree.

The Court has reviewed the transcript of the questions put to Simone while under oath and finds that they are directly related to the question which was before the Court on October 16, 1984—whether Simone should be disqualified from representing Philip Leonetti on conflict of interest grounds as he was a potential witness in the Leonetti trial. Where, as here, the questions bear directly on the question before the Court, no further inquiry into the prosecutor's purpose need be made. *See United States v. Nickels, supra,* 502 F.2d at 1176; Gershman, *supra,* 129 U.Pa.L. Rev. at 688.

### c. *Conclusion*

It is the opinion of the Court that no hearing is required to determine whether the defendant was "trapped" into perjuring himself as this question can be answered from evidence already in the record. The Court concludes from a review of the record evidence that Simone's due process rights were not violated.

Our legal system provides methods for challenging the government's right to ask questions; however, lying is not one of them. *Bryson v. United States,* 396 U.S. 64, 72, 90 S.Ct. 355, 360, 24 L.Ed.2d 264 (1969); *see United States v. Wong,* 431 U.S. 174, 178, 97 S.Ct. 1823, 1825–26, 52 L.Ed.2d 231 (1977). In this situation, Simone could have (1) agreed to disqualification, (2) declined to answer, (3) asserted a privilege either not to incriminate himself under the Fifth Amendment or not to disclose attorney-client communications, (4) testified truthfully under a grant of immunity if the government had been willing to offer this, or (5) answered honestly. If, as the government contends, he answered falsely, he took a course that the Fifth Amendment gave him no privilege to take. *Mandujano, supra,* 425 U.S. at 584, 96 S.Ct. at 1780. Defendant's answers were

not induced by governmental tactics or procedures so inherently unfair under all circumstances as to constitute a prosecution for perjury in violation of the Due Process Clause of the Fifth Amendment. Defendant's motion to dismiss the indictment on the ground that he was "trapped" into committing perjury is denied.

### SELECTIVE PROSECUTION DEFENSE

■ Defendant's second contention is that the indictment should be dismissed because the government's conduct in investigating and prosecuting the present case was so outrageous as to constitute "government harassment and intimidation designed to curb zealous advocacy on behalf of unpopular clients." (Defendant's brief, at 19). It is defendant's position that the prosecution was undertaken solely to punish him for defending so-called "organized crime" figures. According to defendant, he has been the victim of secret tapings for approximately three years and, in fact, was indicted for a tax crime in 1984 in the Eastern District of Pennsylvania, although ultimately acquitted of the charge.

The government argues in opposition that it is the defendant's burden to establish that he is the victim of a selective prosecution and that defendant has failed to meet this burden in that he has presented to the Court only unsubstantiated allegations.

Defendant replies that a due process hearing may be necessary to inquire into the government's motives.

The Court concludes that the defendant has not sustained its burden either of proving selective prosecution or to warrant a hearing on the matter. The Supreme Court has made it clear that the decision to prosecute is within the sound discretion of the prosecutor and that courts should be reluctant to examine a prosecutor's motives except in exceptional circumstances:

This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case,

the prosecution's general deterrence value, the Government's enforcement priorities and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern. Examining the basis of a prosecution delays the criminal proceeding, threatens to chill law enforcement by subjecting the prosecutor's motives and decisionmaking to outside inquiry, and may undermine prosecutorial effectiveness by revealing the Government's enforcement policy. All these are substantial concerns that make the courts properly hesitant to examine the decision whether to prosecute.

*Wayte v. United States,* ── U.S. ──, ──, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547, 556.

Therefore, defendant's burden is a heavy one. *United States v. Berrios,* 501 F.2d 1207, 1211 (2d Cir.1974). To shift the burden to the government to prove a non-discriminatory motive to prosecute, defendant must show: (1) while others similarly situated have not generally been proceeded against because of conduct of the type of which he has been accused, he has been singled out for prosecution and (2) the government's discriminatory selection of him has been invidious or in bad faith, such as the desire to prevent his exercise of constitutional rights. *United States v. Myers,* 635 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980); *Berrios, supra,* 501 F.2d at 1211.

Defendant has made no showing as ·to the first part of this two-part test. As to the second part, defendant makes the conclusory allegation that the government has prosecuted him for perjury in retaliation for his exercise of his constitutional right to represent "unpopular" clients. The record does not support such a conclusion.

The record shows that defendant was advised by the government, in advance·of the indictment of his former client Philip Leonetti, that the government was opposed to such representation on the grounds that he was an unindicted coconspirator and a witness to various conspiratorial acts. Defendant was given the opportunity to disqualify himself or to testify truthfully concerning the government's allegations. He was afforded all constitutional safeguards. It is the government's position that the defendant chose instead to lie. The fact that he is an attorney who defends unpopular clients does not make him any different from or his rights any greater than those of any other witness who testifies under oath in a manner which the government believes to be untruthful. There is ample evidence justifying initiation of the prosecution in this case.

Defendant has presented no evidence that he has been singled out for prosecution from others similarily situated. Nor has he presented sufficient facts to create a reasonable doubt about the constitutionality of the prosecution. Therefore, no evidentiary hearing on the defense of selective prosecution is warranted, *United States v. Ream,* 491 F.2d 1243, 1246 (5th Cir.1974), and defendant's motion to dismiss the indictment on this ground is denied.

## CONCLUSION

There is sufficient evidence in the record for the Court to conclude that the defendant is not the victim of either a "perjury trap" or a selective prosecution. Accordingly, defendant's motion to dismiss the indictment on these grounds is denied.