**UNITED STATES of America**

**v.**

**Charles N. CAPUTO, Leonard L. Martino.**

**Crim. No. 85–00150.**

United States District Court,
E.D. Pennsylvania.

April 28, 1986.

As Amended May 1, 1986.

Ronald K. Noble, Gregg Vance Fallick, Asst. U.S. Attys., Philadelphia, Pa., for United States.

Thomas Colas Carroll, Philadelphia, Pa., for Caputo.

Thomas Livingston, Pittsburgh, Pa., for Martino.

## MEMORANDUM

O'NEILL, District Judge.

A grand jury returned a sixteen-count indictment against defendants Charles N. Caputo and Leonard L. Martino. Caputo was Executive Director of the State Government Committee of the Pennsylvania House of Representatives; Martino is a former member of the Legislature.

Count One charges that defendants engaged in a conspiracy to suborn and commit perjury, and to obstruct justice in violation of 18 U.S.C. § 371. Count Two charges that they obstructed justice in violation of 18 U.S.C. § 1503. The remaining fourteen counts charge perjury in violation of 18 U.S.C. § 1621: Counts Three through Five charge that Caputo committed perjury before the grand jury on February 11, 1985; Counts Six through Eleven charge that Martino committed perjury before the grand jury on the same date; and Counts Twelve through Sixteen charge that Caputo committed perjury before the grand jury on March 11, 1985.

Defendants have moved for dismissal of the indictment or, in the alternative, suppression of their February 11, 1985, grand jury testimony. For the reasons set forth herein, we will grant the motions to dismiss Counts I and II and suppress certain evi-

dence; in all other respects, the motions will be denied.

## I

From 1982 until February 1985, the FBI conducted an extensive undercover "sting" operation known as Operation Gallstone. Gallstone involved the use of a number of cooperating individuals, and resulted in numerous indictments. Using the pseudonym Wayne Hess, FBI agent James Vaules, with the assistance of others, pretended to be engaged in the insurance business and held himself out as being interested in participating in a variety of illegal schemes.

From April 1982 to February, 1985, Vaules and other undercover agents met with defendants on numerous occasions and engaged in more than 100 conversations with them, virtually all of which were audio tape recorded. Stipulation ¶ 3.[1] According to the government, those conversations related to, *inter alia,* (1) defendants' request for a $5,000 cash payment to be given to a member of the state legislature and to others to procure the issuance of a license to an undercover company, American Diversified Insurance Company (ADIC), to write insurance in Pennsylvania; (2) defendants' fraudulent "padding" of ADIC's books with worthless mine leases and securities; and (3) defendants' ability to cause, by means of campaign contributions, United States Congressmen to write letters to the U.S. Parole Commission and the Bureau of Prisons requesting a furlough for Jack Goepfert. Goepfert was serving a five-year sentence for conspiracy to commit mail and wire fraud and conspiracy to make fraudulent use of the mails for interstate transportation of false securities.

"As of mid-January, 1985, it was the judgment of Mr. Welsh that, although there existed probable cause to indict the defendants for their activities during the undercover operation, Mr. Welsh believed that the defendants could not be successfully prosecuted because of insufficient evi-

dence to rebut possible defenses that could be raised by the defendants. Therefore, it was Mr. Welsh's judgment that they could not be indicted for such activities." Stipulation ¶ 4.

At the same time, the government developed a plan to determine how defendants would react to being questioned by FBI agents, acting as such, about their conversations and conduct with the FBI undercover personnel during the preceding three years. In accordance with the plan, defendants were interviewed in late January and early February, 1985. The agents did not reveal that defendants had been the subject of a three-year investigation or that their prior conversations had been recorded. The agents filed FBI 302 reports purporting to state what defendants had said during their interviews. Government's memorandum in opposition to defendant Caputo's omnibus pretrial motion, Exhibits C, D, and E.

The FBI and the prosecutor concluded that defendants had lied about the content of their previous conversations with the undercover agents. In late January 1985, the FBI and the prosecutor decided to issue grand jury subpoenas for the appearances of defendants and a sham grand jury subpoena for the appearance of "Hess" (Vaules). After issuance of the subpoenas, defendants and Vaules discussed what the three would tell the grand jury concerning their relationship in the preceding three years. Stipulation ¶ 11.

Defendants appeared before the grand jury on February 11, 1985. No evidence had been presented to any grand jury with respect to the subject matter of the investigation of defendants. The prosecutor believed that there was a substantial likelihood that defendants would lie to the grand jury concerning the content of their conversations with Vaules and Goepfert during the preceding three years. This belief was based on defendants' FBI interviews and their statements to Vaules after

---

1. The stipulation sets forth the testimony which would have been given by the prosecutor, Rob- ert E. Welsh, Jr., had he taken the stand.

the grand jury subpoenas were issued. The prosecutor also recognized that defendants might invoke their Fifth Amendment privilege against self-incrimination. Stipulation ¶ 12.

On the morning of February 11, 1985, FBI Agent Kenney testified about defendants' involvement in the schemes to make a payment to obtain favorable treatment from the Insurance Commission for ADIC and political contributions to secure a furlough for Goepfert. Testimony of Francis J. Kenney before Grand Jury, February 11, 1985, at 12, 15–22.

Near the conclusion of Kenney's testimony, the prosecutor offered the following explanation of how the government would proceed with defendants.

"The agent has told you that it is based upon the evidence or the statements of Caputo and Martino only that one may conclude that there are corrupt state and federal officials. That is what we were interested in and that is what we are looking into and are investigating.

"As of now, the next step we propose to take is to bring in Caputo and Martino and ask them if they, in fact, did arrange these bribes, the bribe pertaining to the Pennsylvania insurance matter and the bribe pertaining to Goepfert's furlough.

"You see then that as of now, there is evidence from which you could conclude that there is—there are potentially dishonest public officials here, at least we have these letters being sent by Congressman ... which suggests somebody in his office may have been involved but as of now, the government, respectfully to the Congressmen, will proceed the only way available and that is to attempt to seek testimony from Caputo and Martino concerning what they did."

Id. at 21–22.

Thereafter, Kenney testified that defendants had been questioned by FBI agents with respect to ADIC's application for a license. He said that defendants' answers were vague; that defendants had acknowledged that they knew and had met with Goepfert and Hess concerning ADIC; and

that defendants stated they had not received money from Goepfert or Hess for favorable action on ADIC's application or for any other matter. Finally, Kenney testified that, to his knowledge, defendants were not questioned specifically about the furlough matter. Id. at 22–23.

The prosecutor then informed the grand jury that he intended to ask defendants about their previous statements and said:

"In fairness to Caputo and Martino, I think that I'd like to be as specific as possible to [sic] the questions I'm going to ask. I recommend that if you have questions you want to ask them, that we discuss it.

\* \* \* \* \* \*

"But for right now, it is the government's theory that the most reasonable step to determine whether or not there are corrupt federal or state officials is to ask these people about it in the absence of any other ideas as to what direction we can take."

Id. at 23–24. He stated that he did not know what the defendants would say, but that they might provide testimony which would incriminate a Congressman in the Goepfert scheme and a state legislator in the insurance licensing scheme. He also stated that:

"On the other hand we may not get honest testimony today, which is a factor that you ought to be forewarned about. They did lie to the agents, it appears, and it's possible. Now, if they do lie, it's likely that we'll bring them back and see if they want, after being confronted with the fact of all the tape recordings, see whether they want to change or see if they want to assist or plead guilty or who knows what."

Id. at 29.

Defendants had been subpoenaed to appear at 2:00 p.m. on February 11.

"When Mr. Welsh arrived at the grand jury room, Caputo and Martino asked him (outside the grand jury) why they had been subpoenaed and what they were to be questioned about. Mr. Welsh

did not wish to discuss the matter with them outside the grand jury room and also did not wish to refuse to answer them because he was concerned that if they were not given an idea of what the questioning would be about they might assert Fifth Amendment privilege and refuse to testify. Mr. Welsh decided to furnish them with copies of the written reports prepared by the FBI of the earlier field interviews of the defendants. He handed them these documents, known as FBI 302s, and stated words to the effect of 'this is what you will be questioned about'. Mr. Welsh's purpose in furnishing the FBI 302s was not to promote or encourage the defendants to give testimony under oath consistent with what was known to be demonstrably false. His purpose was to avoid responding to the defendants' questions in advance of their appearances and to reduce the chance of their asserting Fifth Amendment privilege." Stipulation ¶ 15. Stipulation ¶ 15.

After Caputo identified himself, Welsh informed him that he had the right to excuse himself during the proceeding to discuss any question with an attorney and the right to refuse to answer any question if the answer might be incriminating. Testimony of Charles N. Caputo before Grand Jury, February 11, 1985, at 2–3. The first part of Caputo's testimony was devoted to his review of the 302 reports of his FBI interviews. Caputo made a number of modest additions and clarifications to the reports. The prosecutor proceeded to ask Caputo about conversations he had with Goepfert or Hess concerning attempts Caputo might make on behalf of ADIC to secure a license from the Insurance Commission. *Id.* at 18–22. Caputo is charged with giving perjured answers to these questions. At the conclusion of these questions, Caputo was requested to leave the grand jury room so that the prosecutor could ask the jury whether they had any questions. Before leaving, Caputo asked the prosecutor to identify the target of the investigation. The prosecutor responded:

"I will tell you really only what I was required to do by the Department of Justice. If you have any questions, I would recommend that you, either in writing, either you for [sic] your lawyer contact me about that. I am not at this stage prepared to answer that and, frankly, I don't even think that I could answer that."

*Id.* at 22. Caputo stated that he wanted the record to reflect that the questioning had gone beyond the scope of the 302 reports. Caputo then left the room; upon his return, he was asked about his conversations with Goepfert or Hess concerning his attempts to secure a furlough for Goepfert. *Id.* at 23–27. Caputo is charged with giving perjured answers to those questions as well.

Thereafter, Martino was sworn as a witness and given the same warnings as Caputo with respect to his right to consult with a lawyer and his right to refuse to answer questions. Testimony of Leonard L. Martino before Grand Jury, February 11, 1985, at 2–3. The prosecutor asked Martino questions about Goepfert, other individuals and ADIC, and whether he knew if any money had been paid by Goepfert, Hess or others for the purpose of assisting ADIC to receive a license. *Id.* at 18, 23–24. Martino was also asked whether he participated in discussions concerning ADIC with Goepfert, Hess and Caputo. *Id.* at 20–26. In addition, the prosecutor questioned Martino about Caputo's attempts to secure a furlough for Goepfert. *Id.* at 32–34. Martino is charged with giving perjured answers to some of those questions.

On March 11, 1985, Caputo again appeared before the grand jury; on this occasion, he was warned that he was the target of an investigation into violations of 18 U.S.C. §§ 371 (conspiracy), 1503 (obstruction of justice), and 1621 (perjury). He recanted some of his prior testimony and testified further about his conversations with undercover agents and his attempts to secure a license for ADIC and a furlough for Goepfert. Caputo is charged with giv-

ing perjured answers to some of these questions.

## II

■ Grand jury proceedings are entitled to a presumption of lawfulness and regularity. *In re Grand Jury Proceedings (Johanson)*, 632 F.2d 1033, 1041 (3d Cir.1980). The Court may exercise its supervisory power over grand jury proceedings, however, to protect defendants from prosecutorial misconduct. *See* Note, *The Exercise of Supervisory Powers to Dismiss a Grand Jury Indictment—A Basis for Curbing Prosecutorial Misconduct*, 45 Ohio St.L.J. 1077, 1081 n. 36 (1984) (collecting cases).

> "The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights ... to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before the jury ... and finally, as a remedy designed to deter illegal conduct."

*United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983) (citations omitted).

■ A court may dismiss an indictment if the defendant shows actual prejudice from prosecutorial misconduct before the grand jury. *United States v. Serubo*, 604 F.2d 807, 816–17 (3d Cir.1979). *See, e.g., United States v. Riccobene*, 451 F.2d 586 (3d Cir.1971); *United States v. Bruzgo*, 373 F.2d 383 (3d Cir.1967). Moreover, in this Circuit, a court may exercise its supervisory powers even in the absence of prejudice.

> "[D]ismissal of the indictment may be proper even where no actual prejudice has been shown, if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends, or that the type of misconduct challenged has become 'en-

trenched and flagrant' in the circuit. The view that dismissal of an indictment in the exercise of the supervisory power may be an appropriate remedy to correct flagrant or persistent abuse, despite the absence of prejudice to the defendant, is also accepted in the Second Circuit. *See United States v. Jacobs*, 547 F.2d 772 (2d Cir.1976), *cert. dismissed*, 436 U.S. 31 [98 S.Ct. 1873, 56 L.Ed.2d 53] (1978), (failure to provide warnings to grand jury target); *United States v. Estepa*, 471 F.2d 1132 (2d Cir.1972) (repeated use of hearsay evidence before the grand jury)."

*United States v. Serubo*, 604 F.2d at 816–17; *see also United States v. Rosenfield*, 780 F.2d 10 (3d Cir.1985). The Court of Appeals described the prosecutor's misconduct in *Serubo* as "extreme": he repeatedly asked a witness whether he knew a certain individual and, upon the witness's denial, attempted to connect the individual with organized crime; he also commented to the grand jury on the veracity of the witness. 604 F.2d at 814–15.

Defendants argue that the indictment should be dismissed or, in the alternative, that their February 11, 1985 grand jury testimony should be suppressed because: first, the dominant purpose of subpoenaing defendants was to secure a perjury indictment; second, the prosecutor failed to give defendants target warnings; and third, the government's sting operation, coupled with the sham grand jury subpoena, constitutes excessive governmental involvement in criminal activity.[2]

## III

Defendants argue that the government attempted to ensnare them in a "perjury trap", that is, the government brought defendants before the grand jury with the sole or primary purpose of extracting per-

---

**2.** Defendants also argue that the government deprived them of their right to an impartial grand jury because the prosecutor directed the grand jurors to refrain from asking questions of defendants without first discussing those questions with him. This argument is without merit: our review of those parts of the grand jury transcripts which were submitted to us reveals that the prosecutor did not shape the grand jurors' questions or infringe on their ability to exercise their independent judgment.

jured testimony from them.[3] Defendants' argument is as follows.

The government recorded defendants' conversations with undercover agents and then sent FBI agents not acting undercover to interview defendants about the contents of those conversations. Knowing that defendants had made false statements in their interviews, the government issued grand jury subpoenas to defendants and a sham subpoena to one of the undercover agents. Thereafter, the agent and defendants discussed what the three would tell the grand jury.

Defendants contend that the government put the finishing touches on the trap on the day of their grand jury appearances. Defendants asked the prosecutor why they had been subpoenaed and what they were to be questioned about. The prosecutor refused to answer them except by handing over copies of the FBI interview reports. According to defendants, the prosecutor responded in this way to prevent defendants from invoking their Fifth Amendment privilege against self-incrimination and to encourage them to commit perjury. Finally, the prosecutor asked defendants questions before the grand jury concerning matters that the government knew that defendants had lied about or were intending to lie about.

Defendants contend that the government sought to extract perjured testimony from them; and then, under threat of a perjury indictment, the government hoped that defendants would cooperate and wear recording devices.

Defendants assert that they were trapped because they faced three options before the grand jury: (1) they could recant their prior false statements to the FBI agents and incriminate themselves with respect to a possible prosecution for false statements, 18 U.S.C. § 1001;[4] or (2) they could repeat the statements and thereby commit perjury before the grand jury; or (3) they could invoke their Fifth Amendment privilege and remain silent. Defendants emphasize that the last option was their only safe harbor and that the prosecutor attempted to prevent them from selecting this option by not informing them that they were targets.

■■■ A perjury trap may violate a defendant's Fifth Amendment right to due process if the government had a premeditated design to trap him into committing perjury. *United States v. Simone*, at 1267–1272. A perjury trap may also constitute an abuse of the grand jury process. *See United States v. Crisconi*, 520 F.Supp. 915, 920 (D.Del.1981). Under New York law, an indictment procured through the use of a perjury trap may be invalid because a grand jury does not have the authority to subpoena a witness for the sole or primary purpose of extracting testimony from him in order to prosecute him for perjury. *People v. Tyler*, 46 N.Y.2d 251, 413 N.Y.S.2d 295, 385 N.E.2d 1224 (1978) (Breitel, C.J.). The Court need not reach the question whether it would exercise its supervisory power if this had been the government's sole or primary purpose, because we do not find such a purpose.[5]

Defendants assert that the Court should find an intention[6] to extract perjured testi-

---

**3.** *See United States v. Simone*, 627 F.Supp. 1264 (D.N.J.1986) for a discussion of the perjury trap defense. *See also* Gershman, *The "Perjury Trap"*, 192 U.Pa.L.Rev. 624 (1981).

**4.** In a similar case, also involving Agent Vaules, the United States Court of Appeals for the First Circuit held that a defendant was not liable for prosecution pursuant to 18 U.S.C. § 1001 for false statements made to an FBI agent because § 1001 does not cover FBI interviews. *United States v. Chevoor*, 526 F.2d 178, 182 (1st Cir. 1976), *cert. denied*, 425 U.S. 935, 96 S.Ct. 1665, 48 L.Ed.2d 176 (1975). However, the Supreme Court overruled *Chevoor sub silentio* in *United*

*States v. Rodgers*, 466 U.S. 475, 104 S.Ct. 1942, 80 L.Ed.2d 492 (1984), holding that false statements made to an FBI agent in the course of a criminal investigation are proscribed by § 1001.

**5.** Neither the Supreme Court nor the Court of Appeals for the Third Circuit has decided whether a perjury trap would violate a defendant's Fifth Amendment due process guarantee or constitute an abuse of grand jury proceedings.

**6.** It is not clear whether the Court should employ a subjective or an objective test to determine the government's purpose. We need not

mony from the facts that: the prosecutor suggested that the grand jurors refrain from asking any questions because the "phrasing of questions is critical" Testimony of Francis J. Kenney at 24; the prosecutor gave defendants the FBI interview reports to induce them to testify in a manner consistent with the statements therein, which the prosecutor knew to be false; and the February 11, 1985, questioning before the grand jury was simply a reenactment of the FBI interviews.

■ The government may call a witness with the expectation that he may commit perjury, but it may not call the witness for the purpose of securing a perjury indictment. *See United States v. Chevoor*, 526 F.2d at 182; *United States v. Nickels*, 502 F.2d 1173, 1176 (7th Cir.1974), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. Gonzales*, 620 F.Supp. 1143, 1148 (N.D.Ill.1985); *see also Gershman, supra*, 129 U.Pa.L. Rev. at 685. It is clear that the government anticipated that defendants might or would commit perjury; however, we do not find that they were subpoenaed for the sole or primary purpose of extracting perjured testimony.

■ The prosecutor's statements to the grand jury reveal that, while he recognized that defendants might perjure themselves, he also recognized that they might provide information about the pending investigation. Testimony of Francis J. Kenney at 21–23; 28–29, quoted *supra* at 1483. In addition, answers to many of the prosecutor's questions could have disclosed information that would have been useful in the investigation. For example, the prosecutor asked Caputo, "Did you take any steps to assist in qualifying ADIC to do business in Pennsylvania?" and "Did you pay the Congressman anything for [a furlough request] letter?" Testimony of Caputo, at 17, 25. The prosecutor asked Martino, "Do you know of any money being paid by Jack Goepfert, Wayne Hess or Mike Neal with intent to gain political influence?"; "Do you know of anybody taking money from Wayne Hess or the others for the purpose of procuring political influence?"; "Do you know how [Goepfert] got that furlough? Do you know anything about it?"; "... [D]o you know if Caputo asked for anything in return [from a Congressman] for getting [the furlough request] letter written?" Testimony of Martino, at 18, 31, 33. Defendants' answers to those questions could have produced information about the extent of defendants' involvement in political corruption, if any, as well as information about certain public officials who were suspected of taking bribes.[7]

There is no evidence on which to base a finding that the prosecutor gave defendants' their FBI interview reports in order to induce them to testify falsely and in a manner consistent with the reports. To the contrary, the stipulation states that the prosecutor would testify that his purpose "was not to promote or encourage the de-

reach this question because we do not find the alleged sole or primary purpose under either test.

**7.** We view the prosecutor's statement that the phrasing of questions was critical as a recognition of the possibility that defendants might or would commit perjury and of the rule that "precise questioning is imperative as a predicate for the offense of perjury," *Bronston v. United States*, 409 U.S. 352, 362, 93 S.Ct. 595, 601, 34 L.Ed.2d 568 (1973). Moreover, since there is no prohibition against a prosecutor asking similar questions to those asked by an agent in an interview, it is irrelevant whether the prosecutor's questions were simply a reenactment of the interviews. The prosecutor may have repeated many of the questions because

"... for many witnesses the grand jury room engenders an atmosphere conducive to truth-telling, for it is likely that upon being brought before such a body of neighbors and fellow citizens, and having been placed under a solemn oath to tell the truth, many witnesses feel obliged to do just that."

*United States v. Washington*, 431 U.S. 181, 187–88, 97 S.Ct. 1814, 1819, 52 L.Ed.2d 238 (1977). We also find that the prosecutor's intent in responding to defendants' questions about why they had been subpoenaed is not relevant; the prosecutor explained their Fifth Amendment privilege to defendants at the start of their grand jury appearances and defendants could have elected to remain silent.

fendants to give testimony under oath consistent with what was known to be demonstrably false." Stipulation ¶ 15. It is also agreed that the prosecutor would testify that he supplied the reports to avoid responding to defendants' questions in advance of their appearance and to reduce the chance that defendants would assert their Fifth Amendment privilege before the grand jury. *Id.*

We note that this case differs markedly from the only case the parties and the Court could find which dismissed an indictment because a witness was subpoenaed for the sole or primary purpose of extracting perjured testimony. *People v. Tyler, supra.* In that case, the prosecutor questioned the witness extensively about irrelevant details of prior conversations. Answers to those questions could not have led to information which would have been relevant to a crime which the grand jury was investigating. *See People v. Tyler,* 46 N.Y.2d at 256–58, 413 N.Y.S.2d at 297–98, 385 N.E.2d at 1227–28. In the present situation, the prosecutor's questioning of defendants could have led to information relevant to the investigation of public corruption.

## IV

█ Defendants argue that the Court should exercise its supervisory power to dismiss the indictment because defendants were not notified of their target status. Although the Constitution does not require that target witnesses be warned of their target status,[8] the Justice Department "... will continue the long-standing internal practice ... to advise witnesses who are targets of the investigation ... that their conduct is being investigated for possible violation of federal criminal law." United

States Attorney's Manual, § 9–11.260 (1984). We have been cited to no authority establishing that a Court may dismiss an indictment or exclude evidence because of a violation of Department of Justice internal guidelines.[9]

Defendants also argue that the Court should exercise its power because of an admonition in *United States v. Crocker,* 568 F.2d at 1055–56. As program director and disc jockey of a radio station, Crocker selected the records to be played by the station. He appeared twice before a grand jury investigating whether illicit cash payments had been made to program directors and announcers to influence their selection of records. Before his first appearance, his attorney, a civil litigator, asked the prosecutor whether Crocker was a target; the attorney explained that if Crocker were a target he would advise him to retain a criminal lawyer. The prosecutor stated that Crocker was not a target. A year later, Crocker was again subpoenaed to appear; his attorney again asked whether he was a target and was told that Crocker's status had not changed. Thereafter, Crocker was indicted for perjury for denying that he had received cash payments from certain companies to promote their records.

Crocker argued that he was a target during his second appearance before the grand jury because the government knew that his statements during his first appearance were false. Citing *United States v. Jacobs,* 547 F.2d 772 (2d Cir.1976), he asserted that testimony given during his second appearance should be suppressed because he had been misled about his target status. In *Jacobs,* the Court of Appeals for the Second Circuit affirmed an order suppressing grand jury testimony and dis-

---

**8.** A potential defendant has no right under the Fifth Amendment's self-incrimination or due process clauses to a warning that he is a target witness before a grand jury. *United States v. Washington,* 431 U.S. at 189–90, 97 S.Ct. at 1820; *United States v. Crocker,* 568 F.2d 1049, 1055 (3d Cir.1977).

**9.** The Manual states:

"This Manual provides only internal Department of Justice guidance. It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful litigative prerogatives of the Department of Justice." *Id.* § 1–1.100.

missing a perjury indictment because a Strike Force attorney had not followed the long-established, uniform practice among United States Attorneys in the Second Circuit of warning target defendants that they were the subjects of a grand jury investigation. The *Crocker* Court agreed that Crocker was a target, but did not suppress his testimony. It declined to follow *Jacobs* because there was no established practice in the Third Circuit of giving target warnings. The Court stated, however:

"... in the future, United States Attorneys in the Third Circuit should not be surprised if, pursuant to our supervisory powers over the manner of conducting grand jury proceedings, we were to follow *United States v. Jacobs, supra,* especially where, as here, specific inquiry is made on the defendant's behalf."

568 F.2d at 1056.[10]

Defendants argue that the future is now. The government responds that *Crocker* is not pertinent because defendants were not targets and that, even if they were, the prosecutor did not mislead defendants into thinking that they were not targets.

The Manual defines a target as "a person as to whom the prosecutor or the grand jury has substantial evidence linking him/her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant," § 9–11.260. According to *Crocker*, "the test is not whether he 'necessarily' will be indicted, but whether according to an objective standard he could be indicted." 568 F.2d at 1054.

■ The government asserts that defendants could not be considered putative defendants with respect to their involvement in criminal activity relating to bribery and similar offenses: the government would not seek an indictment for these crimes because the evidence against them consisted only of their own assertions that they engineered bribes. *See* Stipulation

¶ 4; *see also* Government's response to defendant Caputo's omnibus pretrial motion, at 30. This argument misses the mark because it fails to recognize that defendants could have been considered targets of an investigation for conspiracy to commit perjury, to suborn perjury and to obstruct justice in violation of 18 U.S.C. § 371, obstruction of justice in violation of 18 U.S.C. § 1503, and making false statements in violation of 18 U.S.C. § 1001. The government possessed evidence of these offenses prior to defendants' appearances before the grand jury. Accordingly, we conclude that defendants were targets, who, pursuant to the Manual, should have received target warnings.[11]

■ Nevertheless, we will not suppress defendants' grand jury testimony or dismiss the indictment for failure to give the warnings. First, *Crocker* is distinguishable from this case. In *Crocker*, the prosecutor stated that defendant was not a target; here the prosecutor was non-responsive to defendants' queries. Moreover, the prosecutor's misleading statement to Crocker's attorney was particularly harmful because it effectively denied Crocker experienced criminal counsel.

Second, in *Crocker*, a more serious case, the Court of Appeals did not exercise its supervisory power, nor did it announce with certainty that a prophylactic rule would be applied in future cases in which the target was not warned.

Third, the Court is not persuaded that defendants were prejudiced by the lack of a warning. Defendants are lawyers and swore to tell the truth; they knew or should have known that they could be prosecuted for perjury if they made false statements before the grand jury. As the Chief Justice stated in *United States v. Washington*, 431 U.S. at 189, 97 S.Ct. at 1820:

---

**10.** *Crocker* was decided on November 29, 1977. The United States Attorney's Manual was revised on August 17, 1978, to include the statement that targets should be notified of their target status. § 9–11.253 (1978).

**11.** Because we conclude that defendants were targets of this investigation, we need not reach the question whether defendants were targets of the investigation of bribery and related offenses.

"... [w]e do not understand what constitutional disadvantage a failure to give potential defendant warnings could possibly inflict on a grand jury witness, whether or not he has received other warnings. It is firmly settled that the prospect of being indicted does not entitle a witness to commit perjury and witnesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are. Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights."

See also Appeal of Angiulo, 579 F.2d 104 (1st Cir.1978).

Fourth, since defendants were not prejudiced, the Court may exercise its supervisory power to suppress the testimony or dismiss the indictment, only "... if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends, or ... the type of misconduct [that] has become 'entrenched and flagrant' in the Circuit." United States v. Serubo, 604 F.2d at 817. There is no evidence that the prosecutor's failure to warn was motivated by sinister ends or that failing to warn targets is an entrenched and flagrant practice in this Circuit.

Fifth, and perhaps quite obviously given the above analysis, exercise of the Court's supervisory power is not warranted in light of the purposes underlying the use of this power. Since defendants have no right to receive target warnings, no remedy is necessary to protect any such right or to deter illegal conduct. Nor do we need to exercise the power to ensure that the indictment rests on appropriate considerations validly before the grand jury. See United States v. Hastings, 461 U.S. at 505–07, 103 S.Ct. at 1978–79.

V

Defendants argue that the government's sting operation, coupled with the sham grand jury subpoena, constitutes prosecutorial misconduct and an excessive governmental involvement in criminal activity amounting to a deprivation of defendants' due process guarantees. The bulk of defendants' argument relates to the government's purported perjury trap, an issue which has been addressed above. We now turn to the propriety of the government's issuance of a sham grand jury subpoena, which raises a serious question, apparently of first impression.[12]

On January 23, 1985, a grand jury subpoena ad testificandum was issued for "Wayne Hess," the pseudonym for Agent Vaules. The government acknowledges that the subpoena was a "sham", Stipulation ¶ 10. Its issuance was part of the undercover operation. According to the government, defendants contacted Vaules to inform him that they had been interviewed by the FBI and that they had lied about important matters. Government's response to defendant Caputo's omnibus pretrial motion, at 5–6. Vaules told defendants that he had been directed to appear before the grand jury and showed them the sham subpoena. Defendants then had conversations with Vaules in which they told him what they intended say to the grand jury and what Values should say. These conversations, according to the government, "clearly indicated" that defendants would lie before the grand jury. Id. at 6.

■ Defendants object to the issuance of the sham subpoena on three grounds. First, the issuance of the sham subpoena "boxed" defendants into incriminating themselves before the grand jury because truthful testimony would have incriminated them with respect to obstruction of justice and false statements offenses, and false testimony would have made them indictable for perjury. This argument is merely a

12. Compare Durbin v. United States, 221 F.2d 520, 522 (D.C.Cir.1954) (dictum criticizing prosecutor's issuance of grand jury subpoena returnable to United States Attorney's Office when witness was questioned at prosecutor's office as if under grand jury's authority).

modification of defendants' perjury trap contention; it ignores the fact that defendants could have invoked their Fifth Amendment privilege before the grand jury. *See, supra,* part III. "Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious position to later complain that his answers were compelled." *United States v. Washington,* 431 U.S. at 188, 97 S.Ct. at 1819.

Second, issuance of the subpoena bolsters defendants' argument that the sole or primary purpose of subpoenaing defendants was to procure perjured testimony. They argue that the agent used the sham subpoena to maintain his cover and to elicit from defendants the information that they intended to lie before the grand jury. This argument is equally unpersuasive. The government may subpoena a witness with the expectation that he will commit perjury. This is not the same as calling a witness for the sole or primary purpose of procuring perjured testimony. *See, supra,* part III.

Finally, defendants contend that, even if they were not prejudiced thereby, issuance of the sham subpoena is an element of the government's abuse of the grand jury proceeding. The Court of Appeals for the Third Circuit has been particularly active in exercising its supervisory powers regarding the enforcement of grand jury subpoenas. In this Circuit, a minimal showing by affidavit of the existence of a proper purpose is a precondition to enforcement of such subpoenas. *In re Grand Jury Proceedings,* 507 F.2d 963, 964–65 (3d Cir.), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2424, 44 L.Ed.2d 685 (1975) (*Schofield II*). In that case, the Court stated:

> "Despite the fact that the burden is generally on the witness to show abuse of the grand jury process, *Schofield* I re-

quires the government to present affidavits in *every* case irrespective of whether the witness has challenged the propriety of the subpoena. This broad rule is designed to prevent abuse of the grand jury process by requiring a *minimum* disclosure of the grand jury's purpose in every case."

507 F.2d at 965 (emphasis in original).

Defendants argue that the *Schofield* decisions, and particularly this above-quoted language, create an obligation on the part of the prosecutor to authorize only good faith subpoenas, and that the subpoena issued to "Wayne Hess" was not issued in good faith as there was no such person and the prosecutor never intended to call Vaules. We believe that this case is not controlled by the *Schofield* line of cases because, in those cases, the government sought enforcement of subpoenas pursuant to 28 U.S.C. § 1826(a). *See United States v. Oliva,* 611 F.2d 23 (3d Cir.1979). This is not such a proceeding.[13] We also believe, however, that the *Schofield* cases stand for the proposition that grand jury subpoenas must be issued for some proper purpose.

 Whether or not *Schofield* is pertinent, we cannot avoid the conclusion that the government's conduct in issuing the sham subpoena was improper and amounts to prosecutorial misconduct. A subpoena is an order of the Court. It is issued by the Clerk under the seal of the Court and a failure to obey it can be deemed a contempt of the Court. *Fed.R. Crim.P.* 17(a), (g). The Court recognizes that United States Attorneys may fill in blank pre-signed grand jury subpoenas without actual prior authorization by the grand jury,[14] or the Court. The existence of this practice (if it is a practice) does not give a prosecutor the authority to create a phony subpoena. Litigants, attorneys, and

---

**13.** The government argues that defendants have no standing to challenge the issuance of the subpoena because defendants do not contend that the subpoena infringed on any property right or privilege, citing *In re Grand Jury Matter (District Council 33 Health and Welfare Fund),* 770 F.2d 36, 38 (3d Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 574, 88 L.Ed.2d 558 (1985). That

case, however, also involved a challenge to the enforcement of a subpoena and not a challenge to the issuance of a sham subpoena.

**14.** *See United States v. Santucci,* 674 F.2d 624, 627 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983).

the public are entitled to assume that judicial orders are what they purport to be.

 The government properly may use a host of ploys in furtherance of an undercover investigation,[15] but issuance of a spurious order of Court obviously exceeds the bounds of propriety. It reflects upon the integrity of the judicial process; when the government issues a sham subpoena, and it becomes known that it is a sham, it may appear that the Court has improperly participated in the government's investigation.[16] Such an appearance could impair the public's confidence in the Court's role as an impartial adjudicator.

 Mindful of our obligation to avoid unnecessary decision of constitutional questions,[17] we consider whether the prosecutor's misconduct justifies exercise of our supervisory power. In the absence of prejudice we can exercise that power only if there is evidence that issuance of the subpoena was something other than an isolated incident unmotivated by sinister ends, or that issuance of such subpoenas has become an entrenched and flagrant practice. *United States v. Serubo*, 604 F.2d at 817. Since there is no such evidence in the present record, we must decide whether defendants were prejudiced by issuance of the subpoena.

The subpoena helped to maintain the agent's cover and to elicit incriminating statements from defendants in their conversations with the agent after the subpoena issued.[18] We are hesitant to conclude that but for the issuance of the sham subpoena the conversations and incriminating statements would not have occurred.

However, Vaules showed the subpoena to defendants and we therefore believe that it was a significant factor in bringing about those conversations and statements. Defendants are prejudiced thereby because the statements are the basis for the conspiracy and obstruction of justice charges. Accordingly, we will grant the motions to dismiss Counts I and II of the indictment.[19] Moreover, because these conversations and statements conceivably could be admissable against defendants on the remaining counts, all evidence concerning any conversations of either or both defendants with Agent Vaules on or after the date of issuance of the sham subpoena will be suppressed.

### ORDER

AND NOW, this 28th day of April, 1986, it is hereby ORDERED:

1. Counts I and II of the indictment are DISMISSED;

2. All evidence concerning any conversations of either or both defendants with Agent Vaules on or after January 25, 1985, the date of issuance of the subpoena to "Wayne Hess", is SUPPRESSED.

3. In all other respects, defendants' motions to dismiss the indictment or, in the alternative, to suppress their February 11, 1985, grand jury testimony are DENIED.

---

15. *See United States v. Murphy*, 768 F.2d 1518, 1527 (7th Cir.1985) (Operation Greylord); *United States v. Jannotti*, 673 F.2d 578 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (Abscam).

16. A court's involvement in the investigation of crimes is limited, *see, e.g., Schofield II* (enforcement of grand jury subpoenas), and public. *But see* 18 U.S.C. § 2516 *et seq.* (wire interception).

17. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 117, 104 S.Ct. 900, 917, 79 L.Ed.2d 67 (1984).

18. We have already rejected defendants' two explanations as to how the subpoena prejudiced them, *see, supra,* at 1490–1491.

19. Since we reach this conclusion, we need not decide whether issuance of the subpoena violated defendants' right to due process; such a violation would not entitle defendants to any relief other than that given to them herein.