**UNITED STATES of America,
Appellant,**

v.

**Leonard L. MARTINO.**

**No. 86–1505.**

United States Court of Appeals,
Third Circuit.

Argued April 6, 1987.
Decided Aug. 5, 1987.

Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr. (argued), Asst. U.S. Atty., Chief of Appeals, Gregg Vance Fallick, Ronald K. Noble (argued), Asst. U.S. Attys., Philadelphia, for appellant.

Irving M. Green (argued), New Kensington, for appellee.

Before SLOVITER and BECKER, Circuit Judges, and FISHER, District Judge.[*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

The district court characterized a grand jury subpoena issued to an undercover agent in the pseudonym under which he was working as "a spurious order" of court which "obviously exceeds the bounds of propriety," and, exercising its supervisory power, dismissed two counts of an indictment returned by the grand jury and suppressed conversations with the agent. In what appears to be a case of first impression, we must decide whether the district court's order should be affirmed.

### I.

#### Facts

Leonard L. Martino, a former member of the Pennsylvania legislature, and Charles

---

[*] Hon. Clarkson S. Fisher, Chief Judge, United States District Court for the District of New Jersey, sitting by designation.

Caputo, the former Executive Director of the State Government Committee of the Pennsylvania House of Representatives (now deceased), were indicted by a federal grand jury in a sixteen-count indictment on charges of perjury, obstruction of justice and conspiracy in violation of 18 U.S.C. §§ 1621, 1503, and 371. The indictment arose out of a five-year multinational FBI undercover operation called "Operation Gallstone".

Beginning in 1982 and continuing until February 1985, Martino and Caputo met with FBI Special Agent Jim Vaules, who was using the pseudonym "Wayne Hess". Vaules pretended to be engaged in the insurance business. The government contends it has numerous recorded conversations during which Martino and Caputo requested payments from Vaules for members of the state legislature to procure issuance of a license to an undercover company to write insurance in Pennsylvania, discussed padding of the insurance company's books to inflate its balance sheet, and represented that they could procure a furlough for a federal prisoner in return for campaign contributions to members of the United States Congress.

In late January and early February 1985, the FBI interviewed Martino and Caputo about their conversations and activities with "Hess". The FBI and the prosecutor, who did not advise Martino and Caputo that their conversations with "Hess" had been recorded, concluded that Martino and Caputo lied in their interview about their relationship with "Hess" and their lack of knowledge of requests for money for bribes and political influence for public officials.

On January 25, 1985, three grand jury subpoenas were issued, for Martino, Caputo, and in the undercover agent's pseudonym of "Wayne Hess". On January 30, 1985, Vaules, acting as "Hess", informed Martino that he had received a grand jury subpoena, although Vaules did not actually pick up the "Hess" subpoena until sometime between February 4, 1985 and February 8, 1985. Caputo and Martino were served with their subpoenas on February 4 and 6 respectively. Martino's and Caputo's subpoenas were returnable on February 11, 1985. The "Hess" subpoena was returnable on February 25, 1985.

According to the government, Martino and Caputo contacted "Hess" to inform him of their interview with the FBI, and had several conversations with him in advance of their grand jury appearances in which they told "Hess" what to say before the grand jury and about the false testimony that they planned to give.

Martino, who is a lawyer, appeared before the grand jury on February 11, 1985. He was apprised of his right to remain silent, but he testified. Martino and Caputo met with "Hess" immediately following their grand jury appearances. According to the government, at that time "Hess" showed his subpoena to Martino and Caputo.[1] Martino and Caputo allegedly informed "Hess" of the testimony they gave and told him what he should say.

On April 22, 1985, the grand jury returned a sixteen count indictment against Martino and Caputo. Count one of the indictment charged the defendants with conspiracy to procure and commit perjury and to obstruct justice by testifying falsely to the grand jury and attempting to induce "Hess" to testify falsely. Count two of the indictment charged Martino and Caputo with the substantive act of obstructing justice based on the same facts alleged in count one of the indictment. The remaining fourteen counts charged the defendants with perjury before the grand jury.[2]

---

1. The district court did not make a determination of the specific date Martino was shown the "Hess" subpoena. The district court denied the government's motion to reopen the record to introduce evidence to show that the "Hess" subpoena was not shown to Martino and Caputo until after they had testified before the grand jury. App. at 95. In light of our disposition of this case, the precise date on which the "Hess" subpoena was shown to Martino is not material.

2. Martino was charged with perjury in counts six through eleven of the indictment. The remaining counts charged only Caputo with perjury.

On June 13, 1985, Caputo filed an omnibus pre-trial motion in which Martino joined. Caputo's motion alleged, *inter alia,* prosecutorial misconduct in issuing the "sham" subpoena to Vaules in the pseudonym of "Wayne Hess," and sought dismissal of the indictment. In the alternative, the defendants sought suppression of their February 11, 1985 grand jury testimony.

The district court filed a memorandum and an order of April 28, 1986, modified by an order of May 1, 1986, dismissing counts one and two of the indictment. The district court's memorandum stated that the court was exercising its supervisory power to dismiss the two counts of the indictment on the ground that issuance of the subpoena in the pseudonym "Wayne Hess" was prosecutorial misconduct which reflects upon the integrity of the judicial process. *United States v. Caputo,* 633 F.Supp. 1479, 1490–92 (E.D.Pa.1986). The district court also suppressed all evidence of any conversations between the defendants and "Hess" which took place on or after January 25, 1985, the date of issuance of the subpoena to "Wayne Hess", on the ground that the subpoena was a significant factor in bringing about those conversations. *Id.* The district court denied the government's motion for reconsideration and consideration of new evidence on the issue of lack of prejudice. App. at 94–99.

The government appeals. This court has jurisdiction of the appeal under 18 U.S.C. § 3731.

## II.

### Discussion

#### A.

##### The District Court's Rationale

In dealing with alleged improper conduct of prosecutors which is not challenged under statutes directed to the particular conduct, *see, e.g.,* 18 U.S.C. § 2518 (procedures for wiretapping), or case precedent disapproving that particular conduct, *see, e.g., Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (entrapment); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (withholding exculpatory material), the courts have analyzed the challenged conduct either under the rubric of prosecutorial misconduct, *see United States v. Birdman,* 602 F.2d 547, 559 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980), or outrageous government conduct establishing a due process defense, *United States v. Twigg,* 588 F.2d 373, 377 (3d Cir. 1978). In this case, although the district court denominated the issuance of the subpoena in the pseudonym of "Wayne Hess" as prosecutorial misconduct, and expressly eschewed reliance on the due process defense, the court's discussion and underlying rationale implicate the due process defense recognized in this circuit.

In analyzing the district court's ultimate conclusion, it is necessary first to review those charges made by the defendants that the district court rejected. In support of their motion for dismissal of the indictment or suppression of their grand jury testimony, defendants first argued that the government attempted to ensnare them in a "perjury trap", contending that "the government brought [them] before the grand jury with the sole or primary purpose of extracting perjured testimony from them." 633 F.Supp. at 1485–86 (footnote omitted). They argued that this trap was furthered when the prosecutor handed them copies of their FBI interview reports in lieu of answering their questions as to why they had been subpoenaed.

The district court found that "[t]here is no evidence on which to base a finding that the prosecutor gave defendants their FBI interview reports in order to induce them to testify falsely and in a manner consistent with the reports." 633 F.Supp. at 1487. Further, the district court found that it was not the government's sole or primary purpose to extract perjured testimony from the defendants. Instead, the court found that while the prosecutor recognized that defendants might perjure themselves, the prosecutor's statements to the grand jury showed he recognized that defendants might provide information about the pending investigation. *Id.* Because the district

court accepted as a fact that "[d]efendants' answers to [questions by the prosecutor] could have produced information about the extent of defendants' involvement in political corruption, if any, as well as information about certain public officials who were suspected of taking bribes," *id.* (footnote omitted), the court rejected defendants' perjury trap argument.

Defendants also argued in the district court that it should exercise its supervisory power to dismiss the indictment because they were not notified of their target status. Again, the district court rejected this contention. Although it concluded that defendants were targets who should have received warning pursuant to Department of Justice Internal Guidelines which provide for notification of grand jury witnesses of their target status [3], the court held that the failure to follow such guidelines in this case did not warrant dismissal of the indictment. 633 F.Supp. at 1488–90. It relied in large part on this court's opinion in *United States v. Crocker*, 568 F.2d 1049, 1053–56 (3d Cir.1977), where we refused to suppress false grand jury testimony even when the government prosecutor misled defendant as to his target status. The district court also noted, 633 F.Supp. at 1489–90, that in *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1977), the Court stated, *inter alia*:

> [w]e do not understand what constitutional disadvantage a failure to give potential defendant warnings could possibly inflict on a grand jury witness, whether or not he has received other warnings.... Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to protection of Fifth Amendment rights.

Finally, the district court turned to defendants' remaining argument "that the government's sting operation coupled with the sham grand jury subpoena constitutes prosecutorial misconduct and an excessive

governmental involvement in criminal activity amounting to a deprivation of defendants' due process guarantees." 633 F.Supp. at 1490. Since the court had already rejected the bulk of defendants' argument, which had related to the purported perjury trap, the only remaining basis for defendants' prosecutorial misconduct and due process challenges was the issuance of what the court termed the sham grand jury subpoena.

Defendants objected to the issuance of the pseudonymous grand jury subpoena on three grounds, two of which the district court promptly rejected. It held first that defendants' argument that issuance of the subpoena "boxed" them into incriminating themselves before the grand jury was really a modification of their perjury trap contention and ignored the fact that they could have invoked their Fifth Amendment privilege. 633 F.Supp. at 1490–91. It found "equally unpersuasive" the contention that issuance of the subpoena bolstered defendants' argument that the sole or primary purpose of calling them was to procure perjured testimony. *Id.* at 1491.

Having thus rejected defendants' argument of actual prejudice from the issuance of the subpoena, at least in the context of its rejection of an alleged perjury trap, the court then considered defendants' final argument "that, even if they were not prejudiced thereby, issuance of the sham subpoena is an element of the government's abuse of the grand jury proceeding." *Id.* The district court's ultimate decision was based on its acceptance of a variant of this contention.

### B.

### *Prosecutorial Misconduct*

■ No case attempts to define the parameters of prosecutorial misconduct. The law is clear, at least in this circuit, that prosecutorial misconduct encompasses at a minimum improper conduct by a prosecutor both at trial, *see, e.g., United v. Rispo*, 460

---

**3.** *See* U.S. Attorneys' Manual § 9–11.260 (1985) (the Justice Department "continues its long-standing internal practice to advise witnesses

who are known 'targets' of the investigation that their conduct is being investigated for possible violation of federal criminal law").

F.2d 965 (3d Cir.1972) (where our holding that prosecutorial deception of court and co-defendants by trying government informant as co-defendant warranted new trial was rationalized also on due process grounds), and in connection with grand jury proceedings. Trial conduct is not at issue here. The conduct in cases considering abuse of grand jury proceedings may be.

We have condemned as improper a prosecutor's threats to a grand jury witness and his description of the witness as a "thief" and a "racketeer", *United States v. Bruzgo,* 373 F.2d 383, 386 (3d Cir.1967); a prosecutor's explanation to the grand jury that a government informer was absent because defendants were connected with organized crime and could therefore harm the witness, *United States v. Riccobene,* 451 F.2d 586, 587 (3d Cir.1971) (per curiam); and a Justice Department special attorney's appearance before the grand jury in the dual role of prosecutor and witness in violation of the American Bar Association's professional standards, *United States v. Birdman,* 602 F.2d 547 (3d Cir.1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 703, 62 L.Ed.2d 668 (1980). We characterized as extreme prosecutorial misconduct before the grand jury a prosecutor's graphic and misleading references associating the defendants with organized crime, *United States v. Serubo,* 604 F.2d 807, 818 (3d Cir.1979).

In addition, in *United States v. DiGilio,* 538 F.2d 972, 985 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 738, 50 L.Ed.2d 749 (1977), we characterized the government's issuance of a "forthwith" grand jury subpoena which facilitated investigatory interrogation in the United States Attorney's office outside the presumably protective presence of the grand jury as a "misuse" of the subpoena. We pointed out that Fed.R.Crim.P. 17 does not authorize the use of grand jury subpoenas as a ploy for the facilitation of office interrogation. *Accord Durbin v. United States,* 221 F.2d 520, 522 (D.C.Cir.1954).

■ Once a court determines that there has been prosecutorial misconduct in the form of some abuse of the grand jury process, it must then determine whether any sanction, such as the dismissal of the indictment and suppression of evidence that the district court ordered here, is appropriate. The Supreme Court has held that a court may not exercise its supervisory power to discipline the prosecutor or warn other prosecutors without considering whether the defendant's rights were adversely affected. *See United States v. Hasting,* 461 U.S. 499, 504, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96 (1983).

In fact, in none of the Third Circuit cases in which we found prosecutorial misconduct before the grand jury did we order dismissal of the indictments. Instead, we looked to whether there was sufficient evidence to support the indictment. In almost all of the cases, we determined that the misconduct was harmless error and not prejudicial. *See, e.g., United States v. Bruzgo,* 373 F.2d at 386–87; *United States v. Riccobene,* 451 F.2d at 587; *United States v. Birdman,* 602 F.2d at 560–61. Even in *United States v. Serubo,* where we stated that "dismissal of an indictment [pursuant to the court's supervisory power] may be virtually the only effective way to encourage compliance [by prosecutors with] ethical standards, and to protect defendants from abuse of the grand jury process," 604 F.2d at 817, we did not automatically dismiss the indictment for the "extreme" misconduct we found there. Instead, we remanded to the district court to determine whether the misconduct infected the second of the two grand juries that participated in the investigation. *Id.* at 818–19. Thus, in every case we looked to prejudice.

In this case, the district court stated that if there was no prejudice it could exercise its supervisory power only if there were evidence that issuance of the subpoena was "something other than an isolated incident unmotivated by sinister ends, or that issuance of such subpoenas has become an entrenched and flagrant practice." 633 F.Supp. at 1492 (citing *Serubo,* 604 F.2d at 817). Because there was no such evidence, the district court looked instead to whether

there was prejudice, which it stated existed because the subpoena helped maintain the cover and elicit the incriminating statements. *Id.* The government argues that there is absolutely no evidence to support the district court's inference that the subpoena was a significant factor in bringing about the statements. We need not reach the government's challenge to the district court's finding of prejudice if there was no prosecutorial misconduct. We therefore turn to that issue.

None of the Third Circuit cases referred to here or by the district court are precedent for the district court's determination that the pseudonymous subpoena was prosecutorial misconduct. In *Serubo* and *Birdman*, although we made no finding of prejudice, we characterized the prosecutors' actions as misconduct because they were intended to or did raise the possibility of prejudicing the defendants before the grand jury. In this case, the grand jury was unaware of the "Hess" subpoena and could not have been prejudiced by its issuance. Likewise, the subpoena that is challenged was not issued to the defendants, as in *DiGilio* and *Durbin* where subpoenas were used to compel statements from the defendants. The government argues that the purpose of the "Hess" subpoena was to perpetuate Vaules' cover, and on the current state of the record we have no basis to dispute that contention.

We have previously expressed, although in a different context, our reluctance to involve the judiciary in second-guessing the propriety of the executive branch's determination to employ undercover investigative methods, including scams, to ferret out crime. This court, speaking in banc of the government's ABSCAM operation, stated that because official corruption can easily elude detection "[a] determination of what undercover operations are necessary to discover and expose corruptible public officials must be left, in the first instance, to that branch of government which has the responsibility for maintenance of public order." *United States v. Jannotti*, 673 F.2d 578, 609 (3d Cir.) (in banc), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). We continued, "the conduct of

agents of the executive branch who must protect the public from crime is more appropriately considered through the political process where divergent views can be expressed in the ballot box." *Id.*

If government officials may pose as nonexistent sheiks in an elaborately concocted scheme, *see id.*, supply a necessary ingredient for a drug operation, *see United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973), and utilize landing strips, docking facilities, and other accoutrements of an organized smuggling operation, *see United States v. Ward*, 793 F.2d 551, 553 (3d Cir.1986), all in order to catch criminals, then their use of a subpoena in the name of an undercover agent to enable him to retain his credibility with suspected criminals seems innocuous by comparison.

The district court distinguished the undercover techniques upheld in *Jannotti* from the facts in this case on the basis of the following reasoning:

> [I]ssuance of a spurious order of Court obviously exceeds the bounds of propriety. It reflects upon the integrity of the judicial process; when the government issues a sham subpoena, and it becomes known that it is a sham, it may appear that the Court has improperly participated in the government's investigation. Such an appearance could impair the public's confidence in the Court's role as an impartial adjudicator.

633 F.Supp. at 1492 (footnote omitted).

The government had stipulated that the subpoena issued to "Wayne Hess" was a "sham" in the sense that Vaules' pseudonym was used therein. The subpoena was "sham" in the same sense that any undercover agent using a false name or purporting to be someone s/he is not is "sham". Since that deception is the very essence of an undercover operation, the district court's repeated characterization of the subpoena as a "sham" does not aid in the analysis of its propriety.

 It is evident from the district court's opinion that the dispositive factor for the court was the possibility that it would ap-

pear from the issuance of the subpoena that the court was involved in the government's investigation. Opinions of this court somewhat forcefully refute any such notion. In *In re Grand Jury Proceedings (Schofield I)*, 486 F.2d 85 (3d Cir.1973), we stated that although grand juries are called into existence by order of the district court, they are "basically ... a law enforcement agency," *id.* at 90 (quoting *United States v. Cleary*, 265 F.2d 459, 461 (2d Cir.), *cert. denied*, 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548 (1959)), and "[t]hey are for all practical purposes an investigative and prosecutorial arm of the executive branch of government." *Id.*

Moreover, grand jury subpoenas are "almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch." *Schofield I*, 486 F.2d at 90. As we noted, although grand jury subpoenas are issued in the name of the district court over the signature of the clerk, "they are issued pro forma and in blank to anyone requesting them." *Id; see also* Fed.R.Crim.P. 17(a) ("The clerk shall issue a subpoena, signed and sealed but otherwise in blank to a party requesting it, who shall fill in the blanks before it is served"); *see also Doe v. DiGenova*, 779 F.2d 74, 80 (D.C.Cir.1985) ("While a federal grand jury subpoena is issued under the authority of a court, the court has no substantive involvement in a particular subpoena unless the subpoenaed party challenges it") (footnote omitted).[4] As the government stresses, no knowledgeable person (Martino was a lawyer) would think the court clerk is involved in the issuance of a particular subpoena. It is

evident that no judge issued the grand jury subpoena since there is no place for a judge's signature.

A court's uneasiness with the prosecutor's actions in utilizing a pseudonymous subpoena as an investigative tool is not a basis to condemn the action as prosecutorial misconduct. The Supreme Court has cautioned against a court's exercise of "a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *United States v. Russell*, 411 U.S. at 435, 93 S.Ct. at 1644.

In its opinion denying the government's motion for reconsideration, the district court suggested that its finding of prosecutorial misconduct was based in part on the government's failure to notify the presiding judge of the issuance of the subpoena. *See* App. at 97. We find the court's suggestion puzzling. Since the basis for the court's determination characterizing a pseudonymous subpoena as prosecutorial misconduct was the "appear[ance] that the Court has improperly participated in the government's investigation," 633 F.Supp. at 1492 (footnote omitted), we fail to see why, under that reasoning, advance notification of the court would not transform the "appearance" of participation into actuality.[5]

It was on the basis of advance notice to the court that the district court here distinguished the decision in *United States v. Murphy*, 768 F.2d 1518, 1528–29 (7th Cir. 1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986), upholding an undercover scheme that involved the courts much more directly than did the issuance of the pseudonymous grand jury subpoena here. In that case, the prosecution actual-

---

**4.** Although the court's actual involvement with the issuance of a grand jury subpoena is limited to issuing a blank subpoena bearing the seal of the court, we have exercised our supervisory power to require the government to make some preliminary showing by affidavit that materials sought by a grand jury subpoena *duces tecum* are properly within the grand jury's jurisdiction and not sought primarily for another purpose. *Schofield I*, 486 F.2d at 93.

**5.** Because there was no advance notification in this case, we express no opinion on the government's "policy decision [made as a result of this

case] that prosecutors in this office will notify the judge supervising the grand jury of intentionally false documents, such as pseudonyms or subpoenas or contrived prosecutions, in our undercover investigations." Appellant's Brief at 22. An alternative course of action might be for the prosecutor to secure the grand jury's approval of issuance of a grand jury subpoena in an undercover name. Of course, advance notification required by Congress stands on a different footing. *See, e.g.*, 18 U.S.C. §§ 2516, 2518 (requiring prosecutor to secure court approval for wiretapping).

ly "concocted [criminal] cases for the purpose of the Greylord investigation" which was designed to investigate corruption of Chicago judges. *Id.* at 1527. One of the judges who was convicted challenged the prosecution's methods on appeal, attacking the operation as a "fraud[ ] on the court" because the cases were not "cases" at all. The Seventh Circuit, in rejecting the challenge, stated that "[t]he agents who made up and testified about the Operation Greylord 'cases' did so without criminal intent. They were decoys, and the Greylord cases made it easier to separate the honest judges from the dishonest ones. It may be necessary to offer bait to trap a criminal." *Id.* at 1529.

Although the court commented that the FBI and the prosecution had notified the Presiding Judge of the Circuit Court's Criminal Division, the State's Attorney of Cook County, and the State's Attorney General and Governor, which "dispels any argument that the *federal* Government has offended some principle requiring respect of the *state courts*," (emphasis added), it also stated, and we agree, "[s]uch notice may not be necessary, and certainly a criminal defendant is in no position to complain of the absence of such notice (for he has no personal right to protect the dignity of the Cook County courts)." *Id.* at 1529. For purposes of the issue before us, the issuance of a pseudonymous grand jury subpoena directed to a cooperative United States agent entails far less "spurious" legal documentation than the Greylord sham cases placed on the court's dockets.

█ Thus, although we appreciate the district court's concern with the integrity of the judicial process, we view the "Hess" grand jury subpoena as comparable to false identification papers or other "cover" accoutrements for an undercover operation. Therefore, we reject the district court's conclusion that issuance of such a subpoena constitutes prosecutorial misconduct.

It is important to stress what this case does not involve. The subpoena was not directed to a defendant and it required no action by a defendant. The district court rejected Martino's contention that the subpoena was issued to trap Martino into committing perjury before the grand jury. Neither the grand jury nor the court were misled by the subpoena in any way. No testimony was presented to the grand jury by anyone pursuant to the subpoena. Significantly, there was no false testimony given as part of the government's operation, unlike the *Murphy* case where FBI agents acting as parties actually testified. We express no opinion as to our view of the effect any such testimony would have on our decision. *See United States v. Archer,* 486 F.2d 670, 676–77 (2d Cir.1973) (expressing disapproval of government investigation which included false arrests and fabricated testimony before the grand jury).

Since we conclude that the issuance of a pseudonymous subpoena to protect a cover in an ongoing undercover investigation was not prosecutorial misconduct, it was error for the district court to have dismissed counts one and two of the indictment and to have suppressed evidence of conversations between Martino and Vaules after the issuance of the subpoena on that basis.[6]

## C.

### Due Process

The government argues that although the district court stated that "we need not decide whether issuance of the subpoena violated defendants' right to due process," 633 F.Supp. at 1492 n. 19, the court reached the "implicit conclusion that the issuance of a subpoena to an agent in his undercover name was improper as a violation of due process." Appellant's Brief at 11. Since prosecutorial misconduct and the due process defense overlap to some extent, we discuss that defense briefly in the context of the facts before us.

In *United States v. Twigg,* 588 F.2d 373, 379 (3d Cir.1978), we held that due process

---

**6.** In light of our decision, we do not reach the government's argument that prosecutorial misconduct cannot be found absent "a finding of a violation of a known duty or a known ethical standard." Appellant's Brief at 25. Nor do we reach the contention that the supervisory power cannot be the basis for suppressing evidence otherwise admissible under Fed.R.Evid. 402.

and "fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was 'outrageous.'" We further explicated the bounds of the due process defense in *Jannotti*. Although we found the contours of the defense "at best, elusive," 673 F.2d at 606, we held that "a successful due process defense must be predicated on intolerable government conduct which goes beyond that necessary to sustain an entrapment defense." *Id.* at 607. We subsequently noted that "this court and other appellate courts have . . . exercised extreme caution in finding due process violations in undercover settings." *United States v. Ward*, 793 F.2d at 554 (quoting *United States v. Gambino*, 788 F.2d 938, 945 n. 6 (3d Cir.), *cert. denied*, — U.S.——, 107 S.Ct. 98, 93 L.Ed.2d 49 (1986)); *see also United States v. Beverly*, 723 F.2d 11 (3d Cir.1983) (per curiam).

Our discomfort with some government tactics does not establish the basis of a due process defense. As the Seventh Circuit stated in *Murphy*.

> In the pursuit of crime the Government is not confined to behavior suitable for the drawing room. It may use decoys and provide the essential tools of the offense. The creation of opportunities for crime is nasty but necessary business.

768 F.2d at 1529 (citations omitted).

█ Under the facts before us, the issuance of the subpoena in the pseudonym "Wayne Hess" did not amount to the type of outrageous conduct necessary to find a due process violation.

## III.

### Conclusion

For the reasons set forth above, we will reverse the order of the district court dismissing counts one and two of the indictment against Martino and suppressing evidence of conversations between Martino and Vaules after the date of issuance of the subpoena.