**UNITED STATES of America**

v.

**ASHLAND OIL INC.**

**Crim. No. 88–146.**

United States District Court, W.D. Pennsylvania.

Jan. 17, 1989.

Charles A. DeMonaco, Asst. U.S. Atty., Pittsburgh, Pa., for plaintiff.

Thomas A. Donovan, Kenneth L. Salmon, Kirkpatrick & Lochkart, Pittsburgh, Pa., for defendant.

## OPINION

DIAMOND, District Judge.

In September of 1988, a grand jury returned a two-count indictment against Ashland Oil, Inc. ("Ashland"), for alleged criminal violations arising out of an oil spill from an Ashland storage tank at Ashland's Floreffe, Pennsylvania, facility on January 2, 1988. Count I of the indictment charges Ashland with violating the Refuse Act of 1899, 33 U.S.C. §§ 407, 411. Count II charges Ashland with violating the Clean Water Act, 33 U.S.C. §§ 1311(a), and 1319(c)(1). Presently before the court is, *inter alia,* Ashland's motion to dismiss the indictment for prosecutorial misconduct. For the reasons set forth below, the motion will be denied.

### I. *Background*

In its motion, defendant Ashland alleges that members of the Allegheny County Fire Marshal's Office and Allegheny County Bureau of Police withheld exculpatory evidence from the defendant and the grand jury and that at least one member of the Fire Marshal's Office committed perjury before the grand jury in relation to this exculpatory evidence. Ashland seeks, at the minimum, an evidentiary hearing so that it may have an opportunity to show that the government's conduct, as alleged, justifies dismissal of the indictment. Because the court will assume, for purposes of this motion, that all the allegations made by Ashland against the government are true, the court concludes that an evidentiary hearing is not needed to resolve this controversy. Rather, the court will rely on

the following assumed facts as represented by Ashland in its motion, brief in support thereof, and reply to the government's omnibus response:

1) On October 7, 1988, in connection with civil proceedings arising out of the January 2, 1988, oil spill, certain members of the Fire Marshal's Office were deposed including Fire Marshal Martin Jacobs and Chief Inspector Charles Kelly.

2) During these depositions both men testified that Ashland had written a letter to the office on May 15, 1986, for the purpose of ascertaining how a permit for construction can be obtained. Both men also testified that Ashland never followed up on this letter and no permit was ever issued. Fire Marshal Jacobs stated that there exists a log book which contains records of all tank inspections. Jacobs further stated that he and his secretary could not find any entries in the log relating to the tank. Chief Inspector Kelly testified consistent with that and stated that he had never performed an on-site inspection of the Floreffe facility and had never made an entry in the log book. The log book, however, was not produced at that time.

3) Subsequently, the log book was subpoenaed and an examination revealed the existence of an entry relating to Ashland's tank. Based upon this entry, a new round of depositions was noticed.

4) On October 14, 1988, Chief Inspector Kelly, Fire Marshal Jacobs, Lieutenant Norman Smilnyak and Deputy Fire Marshal Edward Babyak were deposed.

5) Chief Kelly produced the original log book and indicated that he made the entries referring to Ashland. He could not explain why he indicated on October 7 that there were no entries. He also stated that the entries were a mistake and offered the fact that he was new to the position as an explanation. He maintained he had not made a site inspection and had not approved construction of the tank. Kelly ex-

plained the reference in the log to a "blue special" as a memorandum on blue paper sent to the Fire Marshal's supervisor advising that a certain project had been approved. However, Kelly denied making a blue special in this case.

6) Fire Marshal Jacobs similarly testified. He stated that he could not explain how he had missed the entry in the log. He also stated that the entry was a mistake; there was no blue special; and approval had not been obtained by Ashland.

7) Lieutenant Norman Smilnyak, head of the General Investigations Division of the Allegheny Bureau of Police and supervisor of the Fire Marshal's Office also testified. Lieutenant Smilnyak also stated that there had been no site inspection by Kelly; the entry in the log was a mistake; and there was no blue special.

8) Finally, Deputy Fire Marshal Edward Babynak testified. Babynak produced a copy of the blue special (attachment A). He stated he found it in a file after the spill and made a copy. He testified that he had given the original to Fire Marshal Jacobs on January 5, 1988, in the presence of Chief Inspector Kelly.

9) The blue special in question is a memorandum dated May 19, 1986, from Chief Inspector Kelly to Lieutenant Smilnyak entitled "TANK INSTALLATION AND INSPECTION." The memorandum reads as follows:

On May 19, 1986, this Inspector performed an on site inspection at 204 Glass House Road, Floreffe, PA at the request of Ashland Petroleum Company of Kentucky. Ashland Oil is requesting permission to demolish an existing 72,000 barrel tank and install a new 96,000 barrel tank. The new tank will be used to store #2 fuel oil.

The tank will be of welded steel construction with the roof to shell connection being weak-seam construction to provide proper emergency relief venting in case of fire. The tank will also

be constructed with foam injection chambers for fire fighting.

A dike will also be built to hold the volumn [sic] of contents shoud [sic] a leak develop in the tank.

After reviewing the blueprint an aerial photographs approval has been given to Ashland Petroleum Company of Kentucky to begin their project.

The memorandum bears the signature of Chief Inspector Kelly.

10) In addition to testifying at the above depositions Chief Inspector Kelly testified before the grand jury investigating the oil spill.

11) The United States Attorney's office specially deputized or issued a special delegation of authority to the Allegheny County Bureau of Police which assigned Sergeant Lawrence Wolfson to the case. As part of the government's investigation, Sergeant Wolfson interviewed Fire Marshal Jacobs and Chief Inspector Kelly. Sergeant Wolfson's supervisor is also Lieutenant Smilnyak. Ashland does not allege, however, that Sergeant Wolfson had actual knowledge of the blue special or actually participated in the above-described cover-up.

Based upon the above factual scenario, Ashland argues that the indictment must be dismissed. First, Ashland asserts that the court should exercise its supervisory power over grand jury matters and dismiss the indictment regardless of whether Ashland suffered actual prejudice. Second, Ashland argues that if the court determines that prejudice is required, the indictment should nevertheless be dismissed, because the cover-up and assumed perjury (of Chief Kelly) gave the grand jury the impression that Ashland proceeded to construct the tank without first obtaining a permit. Finally, Ashland argues that the indictment should be dismissed based upon the due process clause of the Fifth Amendment. The government counters by arguing that Ashland must show that it was prejudiced by the alleged government misconduct; and, since prejudice is lacking in the present case, dismissal is inappropriate.

The government also distinguishes those cases relied upon by Ashland in support of its due process argument and argues that Ashland is not entitled to such a defense in the present case.

## II. *Discussion*

In *Bank of Nova Scotia v. United States*, —— U.S. ——, 108 S.Ct. 2369, 101 L.Ed.2d 228, (1988), the Supreme Court specifically addressed the question of "whether a District Court may invoke its supervisory power to dismiss an indictment for prosecutorial misconduct in a grand jury investigation, where the misconduct does not prejudice the defendants." *Id.* at ——, 108 S.Ct. at 2372, 101 L.Ed.2d at 235. In concluding that it may not, the Court centered on the relationship between a district court's supervisory power and the harmless error doctrine. The Court concluded that "a federal court may not invoke supervisory power to circumvent the harmless error inquiry prescribed by Federal Rule of Criminal Procedure 52(a)." *Id.* at ——, 108 S.Ct. at 2374, 101 L.Ed.2d at 237. Specifically addressing the standard of prejudice applicable when a district court is asked to dismiss an indictment prior to the conclusion of the trial, the Court stated "where dismissal is sought for nonconstitutional error ... dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* at ——, 108 S.Ct. at 2374, 101 L.Ed.2d at 238 (*quoting United States v. Mechanik*, 475 U.S. 66, 78, 106 S.Ct. 938, 946, 89 L.Ed.2d 50 (1986)).

Ashland, in seeking to avoid the consequences of an application of the harmless error doctrine in the present case, argues that *Bank of Nova Scotia* is not controlling. First, Ashland asserts that the Supreme Court specifically distinguished those cases where, as here, the prosecutorial misconduct affects fundamental rights. Second, Ashland argues that *Bank of Nova Scotia* has no application where, as here, the government misconduct includes violations of a constitutional magnitude.

■ Regarding the first argument, Ashland is correct in that the Supreme Court did hold that, "as a *general* matter, a District Court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* —— U.S. at ——, 108 S.Ct. at 2373, 101 L.Ed.2d at 237. (emphasis supplied). The Court specifically distinguished those cases "in which the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair, allowing the presumption of prejudice." *Id.* at ——, 108 S.Ct. at 2375, 101 L.Ed.2d at 238. An examination of those cases cited by the Court as examples reveals, however, that this exception was intended to exempt cases where the prosecutorial misconduct actually affected the make-up or structure of the grand jury itself. For example, *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), involved racial discrimination in [the] selection of grand jurors. *Bank of Nova Scotia*, —— U.S. at ——, 108 S.Ct. at 2375, 101 L.Ed.2d at 239. Similarly, *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), involved the exclusion of women from the grand jury. *Bank of Nova Scotia*, —— U.S. at ——, 108 S.Ct. at 2375, 101 L.Ed.2d at 239. Using these cases as guidance, this court finds that the present facts, which center on the nature of evidence presented to or withheld from the grand jury, are distinguished from cases in which the *structural* protections of the grand jury have been compromised. Accordingly, the court concludes that Ashland's attempt to distinguish *Bank of Nova Scotia* on this ground must fail.

Ashland also argues that the present case is distinguishable from *Bank of Nova Scotia* because it involves constitutional violations. Specifically, Ashland asserts that the withholding of exculpatory evidence (the fact that it had obtained permission to begin construction) and perjury before the grand jury (presumed testimony of Chief Kelly that Ashland did not comply with permit requirements and did not obtain a permit to begin construction of the tank) violated Ashland's right to due process of law under the Fifth Amendment to the Constitution. Ashland's argument is twofold. First, Ashland relies on a line of cases involving police and government conduct which was determined to be so outrageous as to violate due process. Second, Ashland argues that a recent Supreme Court decision, *Arizona v. Youngblood*, —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), makes clear that where the government withholds exculpatory evidence in bad faith, the due process clause is violated.

In support of its first argument, Ashland relies on cases such as *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978) and *United States v. West*, 511 F.2d 1083 (3d Cir. 1975). Ashland's reliance on these cases is misplaced.

In *West*, the defendant was convicted of, *inter alia*, unlawful distribution of heroin. Because of overreaching by the government, however, the conviction was reversed. That case involved two government agents: one informer who actually supplied the narcotics in question and an undercover officer who, as prearranged with the informer, bought the drugs from the defendant who had been persuaded to join the deal by the informer. 511 F.2d at 1085. The court concluded that the government's conduct had gone beyond the point of toleration. *Id.*

In *Twigg*, two defendants were convicted by a jury of charges stemming from the manufacture of methamphetamine hydrochloride ("speed"). 588 F.2d at 374. The court reversed the conviction based upon the fundamental fairness or due process defense because government involvement in the criminal activities reached a demonstrable level of outrageousness. 588 F.2d at 380. In that case, the government had: suggested to one defendant the establishment of a speed laboratory; gratuitously supplied about 20% of the glassware and the indispensible ingredient; made arrangements with chemical supply houses to facilitate the purchase of the rest of the materials; provided at no cost to defendants, an isolated farmhouse for use as the lab; and, through an undercover agent, actually led the manufacturing process since neither de-

fendant had the know-how to manufacture speed. *Id.* at 380–81. The court found such conduct to be egregious and concluded that "[f]undamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fermented by them will be barred. *Id.* at 381.

■ Thus, these cases, and cases cited therein, establish a fundamental fairness or due process defense when government overinvolvement in the commission of the crime itself reaches a demonstrable level of outrageousness. Since the present case does not concern government overreaching or overinvolvement in the commission of the crime itself, the court concludes that the due process defense established in this line of cases is inapplicable here.

Ashland also argues that the withholding of exculpatory evidence from the grand jury violates due process. Specifically, Ashland relies on a recent Supreme Court decision, *Arizona v. Youngblood,* —— U.S. ——, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), for the proposition that the bad faith withholding of exculpatory evidence by the government constitutes a violation of due process.

In *Youngblood,* the defendant was convicted of child molestation, sexual assault, and kidnapping. The Arizona Court of Appeals reversed the conviction because the state had failed to preserve semen samples from the victim's body and clothing. —— U.S. at ——, 109 S.Ct. at 333. In reversing the court of appeals, the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Id.* at ——, 109 S.Ct. at 336. Arguing that the withholding of evidence from the grand jury in the present case was in bad faith, Ashland asserts that its due process rights were denied. As set forth below, however, this reasoning is flawed because it is based upon an incorrect presumption by Ashland that the assertedly exculpatory evidence withheld was in fact exculpatory and material to the defense.

In *Youngblood,* the court based its decision on the lack of bad faith by the officials responsible for maintaining the possibly exculpatory evidence. However, the Court also noted that "[t]he possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*." *Id.* at ——, 109 S.Ct. at 336 note *. The Court is referring to *United States v. Trombetta,* 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), in which the defendants sought to suppress the results of blood/alcohol tests because the state had failed to preserve breath samples used in the tests. *Youngblood,* —— U.S. at ——, 109 S.Ct. at 338. In rejecting this argument, the Court noted, *inter alia,* that " 'in the light of the procedures actually used the chances that preserved samples would have exculpated the defendants were slim....' " *Id.* (*quoting Trombetta,* 467 U.S. at 489, 104 S.Ct. at 2534). A concise summary of this materiality requirement is set forth in Justice Stevens' concurring opinion in *Youngblood:*

> Our cases make clear that "[t]he proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt," and the State's failure to turn over (or preserve) potentially exculpatory evidence therefore "must be evaluated in the context of the entire record." *United States v. Agurs,* 427 U.S. 97, 112 [96 S.Ct. 2392, 2401, 49 L.Ed.2d 342] (1976) (footnotes omitted); see also *California v. Trombetta,* 467 U.S. 479, 488 [104 S.Ct. 2528, 2533, 81 L.Ed.2d 413] (1984) (duty to preserve evidence "must be limited to evidence that might be expected to play a significant role in the suspect's defense").

—— U.S. at ——, 109 S.Ct. at 338. Indeed, even Justice Blackmun, who dissented from the majority's bad faith requirement, recognized that the question of materiality is crucial. —— U.S. at ——, 109 S.Ct. at 339. Thus, not only does *Youngblood* require bad faith on the part of the government, it also requires that the evidence withheld be exculpatory and material to the defense.

**276**

In the present case, Count I of the indictment charges Ashland with violating the Refuse Act, 33 U.S.C. §§ 407 and 411. As noted by the government, this offense is a strict liability crime. *See, e.g., United States v. American Cyanamid Co.,* 354 F.Supp. 1202 (S.D.N.Y.1973) (violation of Act is *malum prohibitum* ). Thus, evidence that Ashland had received a permit for construction of the tank cannot negate guilt. Accordingly, the court finds that the existence of the blue special cannot be considered exculpatory or material to the defense of Count I.

As to Count II, Ashland is charged with violating the Clean Water Act, 33 U.S.C. §§ 1311(a) and 1319(c)(1), by negligently discharging and negligently causing to be discharged pollutants. As asserted by the government, however, the existence of a permit for construction of the tank does not negate Ashland's alleged criminal responsibility for its negligence in the construction, inspection, and testing of the tank. Although the indictment makes reference to the failure of Ashland to have a permit, it is a permit to discharge oil, and not a permit to construct the tank which is at issue. Accordingly, the court finds that the blue special is not sufficiently exculpatory to satisfy the standard of constitutional materiality and concludes that the withholding of information relating to Ashland's permission to begin construction of the tank does not violate due process.[1]

Having found that Ashland's constitutional arguments fail, the court concludes that, pursuant to *Bank of Nova Scotia,* the court lacks authority to dismiss the indictment for prosecutorial misconduct unless said conduct prejudiced the defendant. As outlined earlier, the relevant inquiry is whether or not the error was harmless— whether the violation substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision to indict was free from substantial influences of such violations. *Bank of Nova Scotia,* — U.S. at —, 108 S.Ct. at 2374, 101 L.Ed.2d at 238.

As outlined above, evidence relating to Ashland's permit to begin construction of the tank has little, if any, relevance to the charges brought against Ashland by the grand jury. It is difficult for the court to see how the presence or absence of the construction permit could have had a substantial effect on the jury's decision to indict Ashland for negligently discharging and negligently causing to be discharged pollutants.

The court acknowledges that prosecutorial misconduct can, in some cases, be severely prejudicial to a criminal defendant even though irrelevant to the charges brought. However, the court does not believe that the government's withholding of evidence that Ashland had obtained a permit to begin construction is the type of evidence which normally would be expected to incite a grand jury to indict (such as evidence of prior criminal conduct). Therefore, the court finds that the withholding of evidence that Ashland had obtained a construction permit, or the affirmative testimony (by Chief Inspector Kelly) that it had not, could not have substantially influenced the grand jury's decision to indict; nor is there grave doubt that the decision to indict was free from substantial influence of the violation. Accordingly, any error based upon the alleged governmental misconduct is harmless.[2]

---

1. The government also argues that the blue special was not exculpatory because it stated that Ashland was to construct a "new" tank and, since the tank constructed was a used tank, the blue special actually harms Ashland. The court does not agree with this reading of the memorandum and finds that the reference to "new" meant new as in "different" and not new as in "brand new".

 In addition, the court rejects the government's assertion that because the government could have proceeded against Ashland by way of an information and did not have to seek an indictment, Ashland had no right to have exculpatory evidence presented to the grand jury. On the contrary, the court finds that once the government chose to seek an indictment, it was bound by all the normal procedures and requirements associated with grand jury proceedings.

2. In its initial brief, Ashland did not address the *Bank of Nova Scotia* decision. Rather, Ashland relied on a series of decisions by the United States Court of Appeals for the Third Circuit, including *United States v. Serubo,* 604 F.2d 807

■ Up until this point, the court has freely used the term prosecutorial misconduct as a proper description of the government misconduct alleged and assumed in the present case. However, the court notes that Ashland does not allege that the United States Attorney's Office or the Allegheny County Police Officer deputized (Sergeant Wolfson) had actual knowledge of the alleged cover-up and assumed perjury. Rather, Ashland would have the court attribute the actions of members of the Fire Marshal's Office and the Allegheny Bureau of Police to the United States Attorney's Office since that office deputized Sergeant Wolfson, also a member of the Allegheny County Bureau of Police. The court will not do so. Instructive is the *Bank of Nova Scotia* decision relied upon by the court above. In that case, one of the allegedly improper actions by the government was the fact that Internal Revenue Service ("IRS") agents gave misleading and inaccurate summaries to the grand jury just prior to the indictment. —— U.S. at ——, 108 S.Ct. at 2377, 101 L.Ed.2d at 241. The Internal Revenue Service is, of course, an agency of the United States Treasury Department. Rather than attribute the actions of the IRS to the United States Attorney's Office, however, the Court found that there was no prosecutorial misconduct with respect to these summaries and concluded they provided no ground for dismissing the indictment. *Id.* Similarly, the court finds that the fact that Chief Inspector Kelly may have perjured himself before the grand jury and that he and other members of the Fire Marshal Office and Bureau of Police engaged in a cover-up —which the defendant does not allege was known to the United States Attorney's Office and its designated state police representative—does not constitute prosecutorial misconduct on the part of the United States Attorney's Office. Thus, even if the court had found that the conduct did not constitute harmless error, such conduct would not support dismissal of the indictment.

In sum, the court finds that a district court lacks the power to dismiss an indictment for prosecutorial misconduct absent a showing that the misconduct has prejudiced the defendant; that such prejudice is lacking in the present case; that the alleged governmental misconduct did not violate Ashland's due process rights and did not constitute prosecutorial misconduct since there are no allegations that the United States Attorney's Office had knowledge of the alleged misconduct. Accordingly, Ashland's motion to dismiss the indictment for prosecutorial misconduct will be denied. This decision should not, however, be interpreted as countenancing in any way the alleged misconduct. Nor should the fact that the court has *assumed* the truth of certain allegations for purposes of this motion be perceived as an indication of the court's view regarding the *actual* truth or falsity of the allegations.

(3d Cir.1979) and *United States v. Rosenfield,* 780 F.2d 10 (3d Cir.1985), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 709 (1986), which Ashland asserts as authority for the proposition that dismissal of an indictment is appropriate even if no prejudice is shown.

First, the court notes that a subsequent decision, *United States v. Martino,* 825 F.2d 754 (3d Cir.1987), raises questions as to the validity of Ashland's assertion. *See* 825 F.2d at 759. Although Ashland attempts to downplay the significance of the *Martino* decision, the court is not persuaded. In any event, the cases relied upon by Ashland, predate the Supreme Court's *Bank of Nova Scotia* decision; and to the extent they are inconsistent with that decision, they have been effectively overruled and are not binding upon the court. Even if the court were to follow those cases, however, the court concludes that Ashland fails to meet the requirements of those cases by failing to show that the governmental misconduct in the present case is something other than an isolated incident or that the conduct has become entrenched in the circuit. *See Rosenfield* 780 F.2d at 11; *Serubo,* 604 F.2d at 817.

278

ATTACHMENT A

**County of Allegheny**

Bureau of Police
Detective Division

| | | | |
|---|---|---|---|
| **To** | Lt. Norman Smilnyak | **Department** | C.O., General Investigations Fire Marshal's Office |
| **From** | Insp. Charles Kelly | **Department** | Fire Marshal's Office |
| **Date** | May 19, 1986 | | CCR#3336-86 D#651-86 |

**Subject** TANK INSTALLATION AND INSPECTION

On May 19, 1986, this Inspector performed an on site inspection at 204 Glass House Road, Floreffe, PA at the request of Ashland Petroleum Company of Kentucky. Ashland Oil is requesting permission to demolish an existing 72,000 barrel tank and install a new 96,000 barrel tank. The new tank will be used to store #2 fuel oil.

The tank will be of welded steel construction with the roof to shell connection being weak-seam construction to provide proper emergency relief venting in case of fire. The tank will also be constructed with foam injection chambers for fire fighting.

A dike will also be built to hold the volumn of contents shoud a leak develop in the tank.

After reviewing the blueprint an aerial photographs approval has been given to Ashland Petroleum Company of Kentucky to begin their project.

Respectfully submitted,

Chief Insp. Charles Kelly

Chief Inspector Charles Kelly

DEPOSITION EXHIBIT

