**UNITED STATES**

v.

**Jerrill A. BRESLIN, Morris L. Chucas, Louis M. Mayo, Jr., Leslie S. Mersky, Steven Siomkin.**

No. 95–0082.

United States District Court, E.D. Pennsylvania.

Jan. 29, 1996.

---

Stephen Robert La Cheen, La Cheen, Stephen Robert and Associates, Philadelphia, PA, for Jerrell A. Breslin.

Thomas Colas Carroll, Philadelphia, PA, for Morris L. Chucas.

Robert E. Welsh, Jr., Philadelphia, PA, for Louis M. Mayo, Jr.

Alan A. Turner, Turner & Mc Donald, P.C., Philadelphia, PA, for Leslie S. Mersky.

Steven A. Morley, Philadelphia, PA, for Steven Siomkin.

Michael P. Doss, U.S. Attorney's Office, Philadelphia, PA, for U.S.

## MEMORANDUM and ORDER

SHAPIRO, District Judge.

### INTRODUCTION

Defendants Breslin, Chucas, Mayo, and Mersky were indicted by a federal grand jury on February 21, 1995; the 56 count indictment charges defendants with conspiracy (Count I), wire fraud (Counts 2–35), and money laundering (Counts 36–56). The grand jury that handed down the indictment was the fourth grand jury that heard evidence in the matter; however, the matter was not transferred from a prior grand jury.

The indictment charges that the four defendants held themselves out as agents for Turnbull and Sons, Ltd. ("Turnbull") a company based in Philadelphia which allegedly provided assistance to people seeking loans by arranging for letters of credit that could be used as collateral. The indictment further charges that Turnbull threw sufficient conditions and deadlines into the application process so that the alleged victims were unable to close any of the deals, and all of them forfeited the substantial advance fees paid to Turnbull.

Defendants Breslin and Mersky moved to dismiss the indictment.[1] Breslin moved to dismiss the indictment because the prosecutor failed to keep an alleged promise that Breslin could testify before the grand jury. Breslin's motion also alleged that the prosecutor had engaged in prosecutorial misconduct. Mersky's motion alleged that the money laundering counts were not supported by any evidence presented to the grand jury. A trial, expected to last approximately six weeks, was scheduled to begin February 26, 1996. Then, on December 12, 1995, the same grand jury, after hearing some additional testimony, presented a superseding indictment adding Defendant Siomkin.

After reviewing the defendants' motions, the court granted defendants' request for production of transcripts of all testimony re-

---

1. The court granted Defendant Chucas' written motion to join in the motions of Breslin and Mersky; the court gave Defendant Mayo permission to join in the motions at oral argument on January 25, 1996.

ceived by the indicting grand jury and, in addition, ordered the prosecutor to provide the court with the prosecutor's statements to the grand jury for *in camera* review. The court heard oral argument on the motions to dismiss on January 25, 1996. At oral argument, the court provided copies of the prosecutor's statements to defendants because of her additional concerns regarding the prosecutor's conduct before the grand jury. After careful review of the testimony and the prosecutor's statements to the indicting grand jury, the court will grant the defendants' motions to dismiss the indictment based on prosecutorial misconduct.[2]

## DISCUSSION

### I. Legal Standard

■ A district court may not invoke its supervisory powers to dismiss an otherwise valid indictment based on the reliability or competence of the evidence presented to the grand jury. *United States v. Williams,* 504 U.S. 36, 54, 112 S.Ct. 1735, 1745–46, 118 L.Ed.2d 352 (1992); *Costello v. United States,* 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). Defendants urge the court to view this indictment not as based on *insufficient* evidence, but on *no evidence at all* supporting certain counts of the indictment. However, as the *Williams* court explained, "[a] complaint about the quality or adequacy of the evidence can always be recast as a complaint that the prosecutor's presentation was 'incomplete' or 'misleading'". 504 U.S. at 54, 112 S.Ct. at 1746. Therefore, the court declines to consider the alleged absence of grand jury evidence to support individual counts of the superseding indictment.

■ A district court does have the power to dismiss an indictment based on prosecutorial misconduct. This power is limited; in the absence of fundamental errors, a category thus far limited to racial and gender discrimination in the selection of grand ju-

rors, *see Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *Ballard v. United States* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), a harmless-error inquiry applies to claims of prosecutorial misconduct before a grand jury. There must be a showing of actual prejudice to the defendants. *Bank of Nova Scotia v. United States,* 487 U.S. 250, 255–56, 108 S.Ct. 2369, 2374, 101 L.Ed.2d 228 (1988). There is "prejudice" only " 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Id.* (citing *United States v. Mechanik,* 475 U.S. 66, 78, 106 S.Ct. 938, 945, 89 L.Ed.2d 50 (1986).

### II. Prosecutorial Misconduct Before the Grand Jury

Defendants' motions pertain to the indictment filed on February 21, 1995; a superseding indictment was handed down on December 12, 1995. Because the December 12th indictment was returned by the same grand jury that returned the February indictment, the court will review the prosecutor's conduct before the grand jury that presented both the February indictment and the superseding indictment.

### A. Defendant Breslin's Motion

Breslin's motion raises several alleged instances of misconduct: (1) the testimony presented to the grand jury was predominantly hearsay (the reading of transcripts from appearances before prior grand juries and FBI Agent Norris–O'Dowd's testimony about interviews with alleged victims) although the witnesses were available to testify; (2) the prosecutor repeatedly used the term "victim" to describe those who sought assistance from Turnbull; (3) the prosecutor characterized Breslin as a "principal" of Turnbull, and allowed Agent Norris–O'Dowd to suggest that Credit Finance and Turnbull were "almost interchangeable," when they were not; (4)

---

**2.** At the hearing on January 25th, Breslin testified under oath that: he was unable to appear before the grand jury on the date selected by the prosecutor because of a family emergency; the prosecutor assured him that his appearance could be rescheduled, and; that the grand jury returned the indictment before he was given an opportunity to appear. Because the court is dismissing the indictment based on prosecutorial misconduct, the court will not reach the issue of Breslin's right to appear before the grand jury.

the prosecutor allowed testimony that the only "victim" who got money back from Turnbull threatened bodily harm; (5) the prosecutor repeatedly reminded the grand jury of his view of the most culpable persons involved with Turnbull; (6) the prosecutor allowed testimony that Breslin was "well off" and that he probably had assets offshore; (7) the prosecutor allowed testimony that Defendants Breslin and Mersky were involved in a similar enterprise, Turnberry, under investigation in Florida; and (8) the prosecutor advised the jury that the defendants could assert a Fifth Amendment privilege when he knew Defendant Breslin had expressly waived his privilege during the investigation.

■ As to the use of hearsay, it is clear that an indictment may be based on hearsay testimony alone, unless the grand jury is mislead by concealment that it is hearsay and the grand jury would not have indicted the defendant if they had heard eyewitness testimony. *United States v. Ismaili*, 828 F.2d 153, 164 (3d Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988); *United States v. Wander*, 601 F.2d 1251, 1260 (3d Cir.1979). The grand jury was not mislead here.

■ As to the use of the term "victims", the court cautioned the prosecutor in a conference call on January 10, 1996 about the potentially prejudicial effect of such repeated usage, and the prosecutor subsequently gave a curative instruction[3] before the grand jury returned the superseding indictment. It is unlikely that the use of this term substantially influenced the decision to indict.

■ As to the suggestion that defendant held money offshore, the prosecutor immediately elicited from Agent Norris–O'Dowd an admission that the government had no evidence of this. (2/21/95 Norris–O'Dowd Tr. at 19). This might have cured any possible prejudice. Regarding Breslin's and Mer-

sky's involvement in a similar enterprise in Florida, the testimony was appropriate "other acts" evidence relevant to show knowledge and intent concerning the Turnbull activities. Finally, the prosecutor's statement about Fifth Amendment privilege was a correct general statement of defendants' right to assert it made in response to a question by a grand juror (2/21/95 Norris–O'Dowd Tr. at 17–18); the prosecutor in no way implied that any particular defendant had invoked or waived the privilege.

As to Breslin's remaining allegations, the court will discuss its concern with the prosecutor's improper characterization of witness testimony and insertion of personal opinions below.

### B. The Court's Concerns

At oral argument, the court identified several areas of concern with the prosecutor's presentation to the grand jury: (1) the prosecutor attempted to bond with the grand jurors by providing them with donuts at the their first meeting; (2) the prosecutor's frequent suggestions to the jury that his assigned time was short might have had a chilling effect on the jury's right to ask questions; .(3) the prosecutor often made characterizations of the evidence and inserted his own opinions; (4) the prosecutor referred to a *Frontline* television documentary involving one of the defendants and suggested it might be played for the grand jury 'for fun'; (5) the prosecutor's reference to the necessity for transcripts led the jury to believe they did not have the right to hear any testimony they wished from live witnesses; (6) the prosecutor pressured the jury by stating the statute of limitations was about to run on some of the charges; (7) the prosecutor instructed the jury that they did not need to find the evidence supported everything stated in the indictment, but it was sufficient to merely find the main points had support.

---

3. "One other matter I want to bring up because it's been raised, is that we refer to the people who dealt with Turnbull and Sons, the people who paid money and never got assistance in getting a loan or never got the loan closed, we refer to them as victims, we the government. That should not be, prejudice you or bias you in terms of viewing the case. The fact that they are called victims does not mean you have to find

them to be victims. You can find them to be individuals who simply got involved over their heads, didn't comply with their half of the bargain and lost their money because they were supposed to lose their money. I want to make that clear. The fact I call them a victim or the agent calls them a victim should not color your view of the evidence in the case." (12/12/95 Doss Tr. at 10–11).

### 1. Bonding with the Grand Jury

 The grand jury does not belong to the prosecutor; "[the grand jury's] responsibilities ... include both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded criminal prosecutions." *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), quoting *Branzburg v. Hayes*, 408 U.S. 665, 686–87, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972). The prosecutor has an obligation not to engage in techniques, either knowingly or inadvertently, to curry favor with the grand jurors and lead them to abrogate their role as unbiased factfinders. The court finds that it is inappropriate for the prosecutor to provide snacks to a grand jury, and that his suggestion that the donuts were provided because the task they were about to start was unpleasant[4] made the situation worse.

### 2. Time was Short

 At several points, the prosecutor suggested he had a limited amount of time to present his case, or he would be presenting his case in as little time as possible for the convenience of the grand jurors. *See, e.g.,* 12/20/94 Doss Tr. at 20 ("I hope to get through this in three sessions. We will try to get through it a little bit more quickly."); 1/10/95 Doss Tr. at 3 ("I want to get this completed so I don't expect to read all the transcripts we have."); 2/21/95 Doss Tr. at 2 ("I'm not taking the time I'm scheduled for, some amount less than that."); 12/12/95 Doss Tr. at 2 ("Once we actually do proceed with the testimony I don't think I will be more than a half hour. I am the last person. So I'm still going to get you out before too late. The problem is I'm not getting you out as early as you could. I apologize for that.").

This concerns the court for two reasons. First, the prosecutor should not have suggested to the grand jury that their service was an inconvenience to be concluded as soon as possible; jury service is an important obligation of citizenship to be fulfilled patiently and conscientiously. Second, by making timeliness such an issue, the government may have chilled the grand jury's questioning of the prosecutor and of witnesses—a concern that is exacerbated when almost all of the testimony was read from transcripts of prior grand jury proceedings. However, the prosecutor noted at oral argument that the jury did, in fact, ask a number of questions (e.g., twenty questions on February 14, 1995 and ten questions on February 21, 1995).

### 3. Improper Characterization of the Evidence/Insertion of Opinions

 Throughout the grand jury proceedings, the prosecutor improperly characterized the evidence and inserted his opinions regarding the strength and weight of the evidence. On the first day that the prosecutor presented testimony before the grand jury, the prosecutor introduced the matter by stating:

> There was a lot of testimony taken in this investigation. I do not expect to read all of the testimony back to you because I think that, certainly it's up to you, but given some testimony that came later on in the investigation I don't think it will be necessary to read everything back. I think you'll be able to come to a determination of probable cause before we read very much.

12/20/94 Doss Tr. at 2. On the first meeting to consider the superseding indictment, the prosecutor started off by suggesting that although he had copies with him of the indictment the grand jury had previously returned, "I don't think it would be useful for you to read [it], but at least you can glance at and look over and maybe you will remember parts of it." 11/28/95 Doss Tr. at 2. The prosecutor then recounted the story of Turn-

---

4. "This is one of the reasons I brought donuts today. I think after you hear what's about to happen, you won't be too happy, maybe you will.

I had a, we had a long-term investigation that was in a different grand jury that expired. And we did not seek and indictment before that grand jury in time before their expiration. So that entire investigation is being switched into this grand jury, moved into this grand jury.

And I gather you've already had the experience of having transcripts read to you which is what the experience is going to be today." (12/20/94 Doss Tr. at 2).

bull as allegedly described in the indictment and in the testimony before the grand jury. Finally, the prosecutor reached Defendant Siomkin, whom he sought to add to the indictment, and stated "[t]he evidence you are going to hear today concerns three separate victims who dealt specifically with Steve Siomkin.... Each of those victims has advised the government ... that they were told by Siomkin that he personally had closed transactions for the Turnbull company. That was just an outright lie." *Id.* at 7–8.

Such statements and characterizations are clearly inappropriate, and the court is deeply concerned that such statements might unduly influence the grand jury and usurp its role as factfinder.

### 4. *Frontline*

■ The prosecutor stated "[a]s a matter of fact, Les Mersky recently appeared on a documentary on *Frontline* which is a PBS show that airs occasionally explaining one of these transaction [sic] that they had down in Miami, Florida. And maybe just for fun we'll play that." (12/20/94 Doss Tr. at 19–20). The prosecutor was entitled to introduce "other acts" evidence that would tend to show knowledge and intent. However, the reference to the unsworn *Frontline* appearance had no place in the prosecutor's presentation, it was irrelevant and highly prejudicial. By stating that *Frontline* was a "documentary" on "PBS", the prosecutor lead the jurors to believe that a respectable news investigation had been conducted (a contention defense counsel vigorously denied at oral argument) and had reached the conclusion that the defendant was engaged in fraudulent activity. There was no evidence that the *Frontline* story was about anything similar to the issues before the grand jury; the notion that watching the program would be amusing provided no information and served no useful purpose.

### 5. Live Witness Testimony

■ The prosecutor improperly led the jury to believe that it was not entitled to request live witness testimony or that live testimony was unavailable. 2/21/95 Doss Tr. at 8–9 ("I realize this was kind of a dry case to hear after you didn't get a lot of live witnesses which I apologize for.... And it's a lot more interesting I think if we have actual, these people rather than reading their transcripts, have them here present, but unfortunately we couldn't do that since they had already testified."); 1/17/95 Doss. Tr. at 2 ("Jaime Young ... worked for Turnbull and Sons back during the relevant time period. He was described by Peter Bistrian during the testimony read last week as a gofer who looked good. I'm sorry you wont be able to see him because he fits the description."); 11/28/95 Doss Tr. at 10 ("If you recall, two people in this case pled guilty and have testified before the grand jury. Unfortunately they didn't testify live in front of you because we read everything to you.")

The prosecutor offered to make one of the witnesses available, 2/14/95 Norris–O'Dowd Tr. at 75 ("Peter Bistrian, who we read a transcript of testimony to you is available to come in if you feel it's important for you to meet him. But Jaime Young is not really available on short notice. He's out in Oregon. In other words, if you have something in particular you would like to see or hear other than the type of stuff we have been putting in front of you—"); he reminded the jury when they were reviewing the superseding indictment that they had the right to ask for more evidence on anything in the indictment, 12/12/95 Doss Tr. at 6 ("you have a right to ask for testimony on all the aspects of this case.... So you have a right, and I would be happy to do that, to bring in additional testimony on any aspect of this case that you want to have testimony on besides just the additional sections that the superseding indictment adds.").

But it is axiomatic that a grand jury has the right to call witnesses. The grand jurors were instructed by the empaneling judge in his opening charge that they had such a right. However, the prosecutor's repeated suggestion that the witnesses were unable to appear live, a statement which was false since all the witnesses' whereabouts were known, could easily have left a misimpression with the grand jurors. The government's attempts to cure the problem by reminding the grand jurors that they could request any

testimony they wished did not make up for the clear message that because they were hearing transcripts, the live witnesses were unavailable.

### 6. Statute of Limitations

■ On the day the superseding indictment was returned the prosecutor suggested that the grand jury needed to return the indictment quickly because the statute of limitations was about to run on some of the charges. 12/12/95 Doss Tr. at 2–3 ("The one problem is I can't wait until you guys come back in January, I will go over this, but we lose the statute of limitations at the end of this week on some of the charges. So I can't wait. This is—I have to strike when the iron is hot.").

The prosecutor later stated:

[a]nd if you notice, one of these wire fraud charges is 12/13/1990. So that statute will expire after, either tomorrow or after tomorrow. 12/19/90 will expire whenever the 19th is. And, again, all of these are set to expire fairly soon. That does not mean you have to return this indictment. You can decide, I'm sorry, I don't have enough evidence. I still want to hear some more information and we will simply not charge these particular counts. And that's—your job is different than my job. I want to make sure you know that. Don't feel like there's any pressure for you guys to have to return it now just because these are about to expire.

12/12/95 Doss Tr. at 9.

Although the prosecutor tried to cure the initial statement, the jurors clearly received the message that they needed to act quickly because time was running out on the prosecution. At oral argument, the prosecutor estimated that the grand jury deliberated for less than fifteen minutes before returning the superseding indictment. The court realizes that the grand jury was already familiar with much of the material from having returned the first indictment in February and that the prosecutor had just gone over the changes from the original indictment, paragraph by paragraph, before leaving the room. However, the fact that the grand jury took so little time to return such a lengthy indictment leads the court to believe that the grand jury took the prosecutor's improper statements about time running out on certain charges into consideration.

### 7. Improper Charge Regarding What is to be Included in the Indictment

■ Perhaps the most disturbing thing occurred when the prosecutor stated that the grand jury did not have to agree with everything in the indictment; only the "critical" parts.

The prosecutor stated:

In the same way if you return the indictment if it's in the same basic form, it doesn't mean you agree with each and every sentence or each and every line or that you feel there's enough evidence to justify each and every line in the manner and means, it simply means you agree that there was a conspiracy, it was essentially the conspiracy that is laid out in here even if it wasn't every single line. This is more for the benefit of our office in setting forth what our view of the conspiracy is. In terms of what you have to decide as to whether there is probable cause, you don't have to agree with every single line in here. We can talk about that if any of you have any questions. If there is a critical aspect of the conspiracy you disagree with, well, then certainly that's a big difference. But if you simply think, well, I don't remember, I don't think there's evidence here that Credit Swisse was involved, that is not an important point and that's not a point that makes the conspiracy or is a problem with the conspiracy charge.

2/14/95 Doss Tr. at 8–9. It is true that a petit jury need only find one act in furtherance of a conspiracy, although they must be in agreement as to the one act. A grand jury, on the other hand, must return an indictment only if they have probable cause to believe that the persons named in the indictment did the things described in the indictment. They may charge that the means are unclear, or that the acts were committed by one or more specified means, but to suggest to a grand jury that the indictment is a vehicle for the U.S. Attor-

ney's Office to organize its thoughts and theory of the case, that the grand jury should only concern itself with important points—not adequately defined by the prosecutor—and not be concerned if there is not evidence to support presumably unimportant points is a perversion of the grand jury process. It is the grand jury that presents the indictment, not the United States Attorney.

Rule 7 of the Federal Rules of Criminal Procedure states that the indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." The offense is charged by the grand jury, not the prosecutor, based on probable cause grounded in evidence, not the thoughts and theories of the U.S. Attorney's Office. Clearly, an indictment cluttered with means and methods that the grand jury had no evidence to support is unacceptable under the rule.

### III. Prejudice to the Defendants

■ After careful review of the case law, it is clear that one, or perhaps some, of the above mentioned instances of misconduct would not, alone, justify dismissal of the indictment. *United States v. Martino*, 825 F.2d 754, 759 (3d Cir.1987) (surveying case law and concluding that "in none of the Third Circuit cases in which we found prosecutorial misconduct before the grand jury did we order dismissal of the indictments.... In almost all of the cases we determined that the misconduct was harmless error and not prejudicial"). However, in this instance, the court is deeply concerned by the misconduct from the first day the grand jury met continuing through the day the superseding indictment was presented. The cumulative effect of the many instances of misconduct can fairly be said to have "substantially influenced the grand jury's decision to indict". In *United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979), the court, faced with several instances of serious misconduct including: the prosecutor's introduction of admittedly irrelevant, highly prejudicial testimony, the prosecutor's reading of transcripts that seriously distorted the testimony without telling the grand jury that live testimony was available, and the introduction of hearsay testimony in a manner leading the grand jury to believe that it was first-person observation, concluded that "[t]he cumulative effect of the above errors and indiscretions, none of which alone might have been enough to tip the scales, operated to the defendants' prejudice by producing a biased grand jury." The same can be said here.

While the prejudice to defendants is great, the court's decision to dismiss the indictment is not prejudicial to the government; it may now take the case to another grand jury and start with a clean slate. At oral argument, the government admitted that there was no statute of limitations problem with the indictment as a whole, although there may be a question as to whether the statute has run with regard to certain of the numerous counts. *See* 18 U.S.C. § 3288; 12/12/95 Doss Tr. at 9.

Granting the motion to dismiss is in the interest of the administration of justice. This is an unusual case; it is unlikely to lead to a flood of charges of prosecutorial misconduct. It is rare that defendants have sufficient information from *Jencks* material to find a basis for a motion to dismiss. It is unusual that the trial judge would be required to review sufficient material presented to the grand jury to develop a concern for the cumulative unfairness of the grand jury proceedings. It would be easy to overlook the procedural lapses because if, after trial, defendants are acquitted, all this will make no difference, whereas if they are convicted, review is almost impossible, absent some constitutional defect in the composition of the grand jury itself. *Bank of Nova Scotia*, 487 U.S. at 255, 257, 108 S.Ct. at 2373–74, 2374–75; *United States v. Hasting*, 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983) ("Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error."). But it is necessary for the trial judge, when convinced of a grave interference with the independent functioning of the grand jury, to exercise its supervisory role if the court's traditional charge empaneling the grand jury, *see* I *Bench Book for United States District Court Judges* (3d Ed.) 3.02–5,

is more than a mouthful of platitudes and the Fifth Amendment's guarantee of indictment by grand jury continues to have any modern meaning.

An appropriate order follows.

## ORDER

AND NOW, this 29th day of January, 1996, it is hereby **ORDERED** that defendants' motions to dismiss the indictment are **GRANTED** without prejudice to the government to present this case to a new grand jury in a manner in accordance with the accompanying opinion.